Thomas MEALER, Petitioner-Appellant,

v.

Everett JONES, Superintendent, Great Meadow Correctional Facility, Respondent-Appellee.

No. 880, Docket 83–2355.

United States Court of Appeals, Second Circuit.

Argued March 20, 1984.

Decided Aug. 8, 1984.

William E. Hellerstein, New York City (The Legal Aid Society, New York City, of counsel), for petitioner-appellant.

Bruce Allen, Asst. Dist. Atty., New York County, New York City (Robert M. Morgenthau, Dist. Atty., New York County, New York City, of counsel), for respondent-appellee.

Before LUMBARD, NEWMAN, and PRATT, Circuit Judges.

LUMBARD, Circuit Judge:

Thomas Mealer appeals from an order of the District Court for the Southern District, 573 F.Supp. 675, Duffy, J., denying his petition for a writ of habeas corpus. The appellant petitioned to set aside his 1976 conviction in the Supreme Court, New York County, for second degree murder, on the ground that the trial court had erroneously admitted post-indictment statements obtained from appellant in violation of his Sixth Amendment right to counsel. Although we agree that the admission of the statements was error, we find that the

error was harmless, and accordingly we affirm.

## I.

The pertinent facts leading up to appellant's murder conviction and habeas petition are as follows. On the evening of March 23, 1974, Mealer and James Villareal went to the Stag's Head bar in Manhattan. At about 1:30 A.M., a fight broke out between Villareal and another patron, Robert Davis. Davis was knocked to the floor, apparently by Villareal, and then shot in the head at point-blank range as the other patrons looked on. At trial, three eyewitnesses, including John Gaudet, the bartender on duty at the time, testified that Mealer had fired the fatal shot. Mealer left the bar with Villareal, on his way out warning Gaudet not to talk to anyone. Once outside, Mealer handed the gun to Villareal, who threw it in a trash can. Although Villareal returned the following day with the police to search for it, the pistol was never recovered.

Meanwhile, immediately after Mealer and Villareal left the bar, Gaudet called the police, who arrived within a few minutes. Mealer was arrested the following afternoon in his apartment, where the police recovered a red plaid suit matching the description of the suit Mealer wore at the time of the shooting, and eight bullets of the same make and caliber as the bullet that killed Davis. Mealer was charged with second degree murder, and incarcerated in Ossining Correctional Facility pending trial.

About nine months later, Gaudet was approached by Mealer's wife, who asked Gaudet what he intended to say at Mealer's trial. When Gaudet responded that he would tell the truth, Mealer's wife said that Mealer wanted to talk to him, and that, although he did not have much money, he would be willing to "help [Gaudet] out in some way." Two days later, Gaudet contacted the district attorney's office and the police concerning the conversation. They instructed Gaudet to "follow through" with the invitation to speak to Mealer, and "see

what he had to say." In the event that Mealer offered him money, they instructed Gaudet to "play along." The police gave Gaudet $10 to pay for his transportation to Ossining, and tried unsuccessfully to obtain recording equipment for him to take along.

A few days later, on December 13, 1974, Gaudet went to Ossining to see Mealer. Mealer asked Gaudet what he had told the grand jury. When Gaudet responded that he had told them what happened, Mealer suggested that Gaudet change his testimony and say he was coerced into the earlier version by the police. Mealer then indicated his willingness to pay Gaudet to change his story, Gaudet suggested a price of $300, and Mealer said he would get back to him about it. At trial, the statements of both Mealer and his wife were offered by the prosecution, through the testimony of Gaudet, to show Mealer's consciousness of guilt.

The jury convicted Mealer of second degree murder, and the court sentenced him to twenty years to life, a sentence he is currently serving. On appeal, Mealer challenged his conviction on three grounds, including the claim that his post-indictment statements to Gaudet while in prison awaiting trial were made outside the presence of Mealer's counsel, and hence were inadmissible under *United States v. Massiah,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). The conviction was affirmed by the Appellate Division without opinion in October, 1981, and by the New York Court of Appeals in an opinion dated October 14, 1982, in which it rejected all three arguments. 57 N.Y.2d 214, 455 N.Y.S.2d 562, 441 N.E.2d 1080. On March 7, 1983, the Supreme Court denied certiorari. 460 U.S. 1024, 103 S.Ct. 1276, 75 L.Ed.2d 497.

On May 6, 1983, petitioner filed his petition for writ of habeas corpus, raising again the *Massiah* claim concerning his post-indictment statements to Gaudet. On November 1, 1983, Judge Duffy denied the writ. The court acknowledged that Mealer's Sixth Amendment right to counsel had "indelibly attached" in regard to the murder charge once an indictment was filed,

and that Gaudet was acting as an agent of the state when he met with Mealer in prison. Thus, under *Massiah*, any statements concerning the murder charge that Gaudet deliberately elicited from Mealer without Mealer's counsel present would be inadmissible at trial on the charge. However, as the statements were elicited for the purpose of proving Mealer's attempt to suborn perjury from Gaudet—an unrelated charge not yet under indictment and for which Mealer's right to counsel had therefore not yet attached—the court concluded that the incidental use of those statements in Mealer's murder trial did not violate *Massiah*. Mealer appeals from that denial.

## II.

■ The issue raised by appellant's claim falls between two settled principles of Sixth Amendment jurisprudence. Under *United States v. Massiah, supra,* once the right to counsel has attached by the filing of a formal charge, any incriminating statements concerning the charge that the state knowingly elicits from the accused without counsel present are inadmissible at trial. At the same time, courts have recognized that merely because the right to counsel has attached with regard to one charge, a defendant should not be immunized from investigation of other criminal conduct committed thereafter. Therefore, where the post-indictment statements elicited in the absence of counsel concern a new (i.e., as yet uncharged) crime, those statements are admissible in a subsequent trial on the new crime. *See United States v. Hinton,*

543 F.2d 1002, 1015 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 and 429 U.S. 1051, 97 S.Ct. 764, 50 L.Ed.2d 767 (1976), and 429 U.S. 1066, 97 S.Ct. 796, 50 L.Ed.2d 783 and 430 U.S. 982, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977); *see also United States v. Capo,* 693 F.2d 1330, 1339 (11th Cir.1982) (statements concerning conspiracy to possess narcotics made after indictment for possession of narcotics held admissible in trial on indictment for conspiracy), *cert. denied,* 460 U.S. 1092, 103 S.Ct. 1793, 76 L.Ed.2d 359 (1983); *United States v. Missler,* 414 F.2d 1293, 1303 (4th Cir.1969) (statements elicited after indictment for hijacking admissible in a trial for obstruction of justice), *cert. denied,* 397 U.S. 913, 90 S.Ct. 912, 25 L.Ed.2d 93 (1970).

■ The question posed here is whether incriminating statements that concern an already indicted offense may, notwithstanding *Massiah*, be introduced at trial on that offense, if they were obtained coincidentally in the course of an investigation into a new crime for which the defendant has not been indicted.

The First Circuit, the only circuit to rule directly on the question, has held that such statements are admissible at trial, as outside the scope of *Massiah*. *See Grieco v. Meachum,* 533 F.2d 713, 717 (1st Cir.), *cert. denied,* 429 U.S. 858, 97 S.Ct. 158, 50 L.Ed.2d 135 (1976); *United States v. De-Wolf,* 696 F.2d 1 (1st Cir.1982).[1] Although this court has yet to decide the question, we took the opposite position in *dicta* in *United States v. Pineda,* 692 F.2d 284 (2d Cir.1982). While allowing post-indictment

---

**1.** Although respondent and the district court cite the Seventh Circuit as having adopted the same position, the case on which they rely, *U.S. v. Moschiano,* 695 F.2d 236 (7th Cir.1982), *cert. denied,* — U.S. —, 104 S.Ct. 110, 78 L.Ed.2d 111 (1983), we read as far more ambiguous. The defendant in that case had been indicted on charges of conspiracy to distribute heroin and distribution of heroin. One month after the indictment, a government agent met with defendant, posing as a pharmaceuticals salesman. Defendant asked the agent to sell him 50,000 Preludin tablets, which he indicated he intended to sell to truckdrivers, and also made a number of incriminating statements concerning the previous heroin transactions for which he was un-

der indictment. At the heroin trial, the government sought to introduce only that portion of defendant's statements that pertained to the Preludin negotiations; it did not seek to use defendant's admission relating to the heroin charges themselves. The court held that the statements concerning the Preludin negotiations were admissible, as they involved a new and separate crime and did not refer to past misconduct, and thus were not controlled by *Massiah.* 695 F.2d at 241–43. However, the court strongly implied that had the government sought to introduce defendant's admissions directly concerning the heroin charges, they would have been barred under *Massiah. Id.* at 243.

statements obtained during the investigation of a new crime to be introduced at sentencing proceedings on the old crime, we suggested that under *Massiah* the statements would have been inadmissible at the trial itself:

The Court in *Massiah* noted that the government could properly continue investigating the defendant and his confederates even after the indictment was filed; during such an investigation, an informer might lawfully elicit incriminating statements from the defendant. But, the Court held, the government could not use such statements against the defendant at his trial based on that indictment. 377 U.S. at 206 [84 S.Ct. at 1203].

*Id.* at 288. As we adhere to our analysis in *Pineda* of *Massiah* and its progeny, we conclude it was error for the court to admit appellant's statements to Gaudet as they arose out of and concerned the offense for which Mealer was under indictment.

The government's post-indictment investigation in *Massiah*, unlike the investigation here, appears to have been aimed solely at the crime for which defendant was under indictment at the time. *See United States v. Massiah*, 307 F.2d 62 (2d Cir. 1962), *rev'd*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). However, any doubt that the holding of *Massiah* was meant to apply also to statements concerning the indicted offense made in the course of an investigation into "new crimes" appears to have been resolved in the affirmative in *Beatty v. United States*, 389 U.S. 45, 88 S.Ct. 234, 19 L.Ed.2d 48 (1967), *rev'g*, 377 F.2d 181 (5th Cir.1967).

Eight days after the defendant in *Beatty* had been indicted for the illegal sale of a firearm to a customer named Sirles, he contacted Sirles to arrange a meeting. Unknown to Beatty, Sirles had become a government informant. Sirles informed a federal agent of Beatty's request, and on instructions from the agent met with Beatty in Sirles' car, with the agent and a tape recorder secreted in the trunk of the car. At the meeting, Beatty asked Sirles about the whereabouts of the gun he had already sold to Sirles, told Sirles he had additional guns for sale, and threatened Sirles with bodily harm if Sirles testified against Beatty at trial on the pending indictment or provided the gun he had purchased from Beatty as evidence. At Beatty's trial on the original indictment, Sirles testified to the above conversation. On appeal, the Fifth Circuit rejected Beatty's argument that admission of Sirles' testimony violated his Sixth Amendment rights under *Massiah*, concluding that *Massiah* should be limited to situations where "government agents have premeditatively approached the accused with the intention and design of inducing him to make incriminating statements while unaided by his counsel." 377 F.2d at 190. Noting that the *accused* had initiated this meeting and that his statements to Sirles were voluntary and not deliberately elicited by Sirles, the court held that those statements were not barred by *Massiah* and hence were admissible against the accused. The Supreme Court summarily reversed, citing to *Massiah.* 389 U.S. 45, 88 S.Ct. 234, 19 L.Ed.2d 48 (1967).

The facts of this case are virtually indistinguishable from *Beatty.* In both cases, the accused initiated contact with the informant, and himself led the discussion around to incriminating topics. In both cases, the meeting was called to discuss, and indeed commit, new crimes distinct from those for which the accused was already under indictment: suborning perjury in the instant case, and intimidating the witness into perjury and negotiating new illegal sales of firearms in *Beatty.*

The government nevertheless seeks to distinguish this case from *Beatty* on the ground that as the accused in *Beatty* did not announce ahead of time the purpose of his proposed meeting with the informant, the government could not have been certain at the time it instructed the informant to attend the meeting that the accused was embarked on "new crimes". Here, on the other hand, as statements of appellant's wife made clear that "a new crime was

obviously in the offing," the government argues that its follow-up investigation of this new crime was clearly undertaken in good faith, and not as a pretext to circumvent appellant's right to counsel.

■ We are unpersuaded by that argument. *Massiah* stands for the principle that once the Sixth Amendment right to counsel has attached with the filing of formal charges, the government may not use at trial any incriminating statements deliberately obtained from the accused without counsel present, whether through indirect and surreptitious investigations or direct jailhouse interrogations. 377 U.S. at 206–07, 84 S.Ct. at 1203–04. Consistent with that view, the proscription in *Massiah* had been construed not to extend to post-indictment statements obtained from the accused without any deliberate effort on the government's part—*e.g.*, where blurted out or voluntarily made in the presence of government agents, *see United States v. Accardi*, 342 F.2d 697, 701 (2d Cir.), *cert. denied*, 382 U.S. 954, 86 S.Ct. 426, 15 L.Ed.2d 359 (1965); where accidently overheard, or where elicited by a government agent who did not even know of the impending indictment, *see United States v. Garcia*, 377 F.2d 321 (2d Cir.1967).

But the facts of this case demonstrate the fallacy of automatically treating as a similar windfall to the government any information it obtains during a "new crimes" investigation. The "new crime" under investigation here was Mealer's attempt to suborn perjury at the trial on his pending indictment. That crime was intimately related to the pending indictment, and the government must have known that any statements made in the course of suborning perjury would necessarily incriminate Mealer on the murder charge as well. Under the circumstances, we decline to assume that merely because the government was put on notice by appellant that he contemplated a new crime, in empowering its agent to investigate that new crime the government lacked all designs to elicit information concerning the old. Indeed, given that the nature of the new crime proposed also put the government on notice that any discussion between Mealer and Gaudet would almost certainly incriminate Mealer on the old crime as well, we view this, if anything, as an even stronger case than *Beatty* for finding a violation of defendant's Sixth Amendment rights.

The government argues that the factual finding of the New York Court of Appeals that "the police investigation into the new crime was not used as a pretext for circumventing defendant's rights," 57 N.Y.2d at 218, 455 N.Y.S.2d at 564, 441 N.E.2d at 1082, which finding is fairly supported by the record, is binding on this court. *See Sumner v. Mata*, 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1980); 28 U.S.C. § 2254(d)(8). However, that finding is irrelevant to our decision on defendant's Sixth Amendment claim. We do not question that the government had a good faith interest in investigating Mealer's new crime of suborning perjury. We simply conclude that an interest in pursuing the new crime does not preclude a simultaneous interest in pursuing the old.

■ We therefore conclude that the trial court erred in admitting Mealer's post-indictment statements to Gaudet concerning the murder charge. Of course, the government is free to undertake such an investigation anyway without counsel present, and to introduce at trial on a new charge any incriminating statements thereby obtained from an accused. *See Massiah v. United States*, 377 U.S. at 207, 84 S.Ct. at 1203; *United States v. Pineda*, 692 F.2d at 288.

However, as we find that even without Gaudet's improperly admitted testimony concerning Mealer's bribe offer there was overwhelming evidence pointing to Mealer's guilt, we affirm the denial of appellant's petition on the ground of harmless error. *See Milton v. Wainwright*, 407 U.S. 371, 372–73, 92 S.Ct. 2174, 2175–76, 33 L.Ed.2d 1 (1972); *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969); *United States ex rel. Hines v. La Vallee*, 521 F.2d 1109, 1113 (2d Cir.1975), *cert. denied*, 423 U.S.

1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976). The victim was shot at point-blank range inside a barroom, with several eyewitnesses standing only a few feet away. Two of the eyewitnesses, Gaudet and Elaine Dixon, both of whom had known Mealer for several months prior to the murder, testified that it was Mealer who fired the shot. A third eyewitness, Lloyd Smith, who had never seen Mealer prior to the night in question, gave a description of the killer that matched Mealer's appearance, and identified the red plaid suit Mealer wore that night. In addition, Villareal testified that Mealer handed him the pistol after they left the barroom, asking him to dispose of it, and the police recovered from Mealer's room eight bullets matching the bullet that killed Davis. Defendant offered no evidence at trial, and the cross-examination of the government's witnesses failed to discredit their account in any material respect.

Affirmed.