UNITED STATES of America,

v.

Kevin E. WATSON, Appellant.

No. 88–3086.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 14, 1989.

Decided Jan. 19, 1990.

Ferris R. Bond, Washington, D.C. (appointed by this court), for appellant.

William C. Brown, Atty., Dept. of Justice, with whom Jay B. Stephens, U.S. Atty., John R. Fisher, Elizabeth Trosman, and Judith E. Retchin, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before MIKVA, WILLIAMS and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

Dissenting opinion filed by Circuit Judge MIKVA.

D.H. GINSBURG, Circuit Judge:

Following a jury trial, appellant Kevin Watson was convicted of possession with intent to distribute 500 grams or more of cocaine in violation of 21 U.S.C. § 841(a), (b)(1)(B)(ii), and sentenced to 75 months imprisonment. He now appeals that conviction, asserting five grounds for reversal. After discussing his principal points, we affirm.

## I. BACKGROUND

On December 7, 1987, an Amtrak policeman became suspicious of Watson when he discovered that Watson had purchased a train ticket from Miami to Philadelphia with cash, thirty-one minutes prior to his departure, and had given Amtrak an incorrect phone number. Watson had purchased the ticket under the name Fred Roberts, and gave that name to the policeman and three officers of the Drug Enforcement Administration when they first encountered him on the train at Union Station in Washington; he was unable to give the officers any identification other than a piece of paper with the name Fred Roberts printed on it. Following a pat down by one officer, to which Watson consented, Watson produced $1700 dollars from his shoe and explained that he had intended to use the money in order to make a down payment on a house in Florida. The officers then proceeded to another compartment without arresting Watson. A short time later, the officers again encountered Watson in the corridor of the train. After receiving Watson's permission to search his train compartment, one of the officers discovered two packages containing a total of 1283 grams of a mixture that was approximately 85% cocaine. The officers arrested Watson at that time.

At trial Watson testified that he did not know that there were drugs in his train compartment and that he was not "involved with drugs in any way." On cross-examination, Watson admitted that, while in jail, he had met a man named Eugene Young, but denied having told Young that he had been caught with cocaine or having shown him cocaine after his release from jail. The Government later announced that, in order to rebut this testimony, it intended to call Young, a DEA informant who had been incarcerated in the D.C. jail on an unrelated charge when Watson was being held after his arrest.

At an evidentiary hearing, Watson moved to dismiss the case, or to exclude Young's testimony about their jailhouse conversations, on two grounds. First, he made an offer of proof that, when they met in jail, Young represented himself to Watson as an attorney. Watson asserted that Young's false claim induced him to talk to Young and that this action represents "outrageous government misconduct." Therefore, Watson argued, the due process clause of the fifth amendment required either dismissal or at least exclusion of Young's testimony. Watson also argued that admission of Young's testimony would violate his sixth amendment right to counsel, as interpreted by the Supreme Court in *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), because Young was seeking to elicit information from him on behalf of the DEA when they spoke in the jailhouse. The motion was denied and Young testified that while in jail, Watson told him that he had gone to Florida in order to purchase drugs and had been caught at Union Station on his way back to Philadelphia.

Young also testified that after he and Watson had been released from jail, he went to the auto body shop that Watson's family owned and there negotiated to buy

from Watson cocaine, four kilograms of which substance he saw in the back room. Watson sought to exclude this testimony under Federal Rule of Evidence 404(b), which limits the admission of evidence regarding uncharged bad acts, because he was not charged with any crime concerning that incident and it occurred after the events for which he was charged. The court admitted the evidence on the grounds, enumerated in Rule 404(b), that it was relevant both to Watson's intent and to his knowledge with respect to the crime with which he was charged.

Watson's mother and a friend testified that he had a general reputation for truthfulness. Watson did not ask that an instruction on character evidence be added, however, when the court, after the close of the evidence but before closing arguments, asked whether either party wanted any instructions in addition to those it proposed to give. After the jury had been otherwise duly instructed, the court asked if either side had anything further to suggest. At this point, defense counsel first requested that the jury be instructed additionally, per Instruction 2.42 of the Criminal Jury Instructions, District of Columbia (3d ed.), as follows: "On the other hand, the circumstances may be such that evidence of good character may alone create a reasonable doubt of a defendant's guilt, although without it the other evidence would be convincing." The court refused to give the instruction because the request was untimely. The judge stated:

I would have been inclined to give the instruction, if it had been requested earlier, but I feel at this point, to give it now, is really out of context with all of the other instructions, and it seems to highlight that instruction. Therefore, I will deny your request.

Defense counsel made no objection, but merely responded, "Very well." Watson was convicted and sentenced as stated above.

## II. DISCUSSION

We turn now to a discussion of the three principal issues raised by Watson and show why none requires reversal of his conviction.

### A. *The Jailhouse Conversations*

The sixth amendment assures the accused "the assistance of counsel for his defense." A corollary thereto prohibits the Government from using against a defendant "at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after [a formal charge had been filed] and in the absence of his counsel." *Massiah*, 377 U.S. at 206, 84 S.Ct. at 1203; *see also United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). In this case, we conclude that Young was not acting as a "federal agent" at the time of his jailhouse conversations with Watson; therefore, his testimony could not deprive Watson of his sixth amendment right to counsel.

It is established in the case law that in order for there to be a *Massiah*-type violation of a defendant's sixth amendment right to counsel, the person eliciting the incriminating information must be acting as a government agent. In *Henry*, the Court restated the principle that both underlies and limits its reasoning in *Massiah:* "When the accused is in the company of a fellow inmate who is acting by prearrangement as a Government agent ... [he may say something] that an accused would not intentionally reveal to persons known to be Government agents." *Id.* at 273, 100 S.Ct. at 2188. We join the circuits that have expressly "refuse[d] to extend the rule of *Massiah* and *Henry* to situations where an individual, acting on his own initiative, deliberately elicits incriminating information." *United States v. Malik*, 680 F.2d 1162, 1165 (7th Cir.1982); *accord Lightbourne v. Dugger*, 829 F.2d 1012, 1020 (11th Cir.1987); *United States v. Taylor*, 800 F.2d 1012, 1015 (10th Cir.1986). In this regard, it is of no moment that the incriminating conversations took place while the accused was incarcerated; indeed Messiah was not in custody when the relevant conversation took place. As the Supreme Court has stated, in a case where there was no doubt that the interlocutor was a

government agent, "the fact of custody bears on whether the Government 'deliberately elicited' the incriminating statements," *Henry*, 447 U.S. at 274 n. 11, 100 S.Ct. at 2188 n. 11. It does not bear upon the anterior question whether that interlocutor (here Young) was acting on behalf of the Government, however; that depends solely upon whether he was acting upon the instruction of a government official.

Watson argues that several factors suggest that Young was indeed acting as a government agent at the time of their jailhouse conversations: Young had been a DEA informant for two years; he was in regular contact with the DEA while in the D.C. jail; he expected to be paid and to be rewarded with leniency if he produced a case on Watson; and the DEA told him not to pursue the investigation of Watson until Young's release, suggesting (it is claimed) that the Government was directing Young's actions regarding Watson while he was in jail.

As Watson admits, however, there is no evidence that the DEA in any way encouraged Young to talk to Watson. On the contrary, he was in jail on an unrelated charge; while there his conversations with DEA agents concerned only past cases; he did not even mention Watson to the DEA until after the jailhouse conversations had occurred; and he was never in fact rewarded by the Government for information relating to Watson. Based upon these facts, we find without doubt that the Government did not elicit Watson's statements through the agency of Young. On the contrary, Young was acting as an entrepreneur; he may have hoped to make a sale to the Government when he spoke with Watson, but that does not make the Government responsible for his actions, any more than a person who has bought an article from a salesman in the past is responsible if the salesman then steals something similar in the hope of making a second sale. *See, e.g., United States v. Hicks*, 798 F.2d 446, 448–49 (11th Cir.1986) (admission of statement made to person who had been a witness in other cases but who was incarcerated with defendant by "luck or happenstance" does not violate sixth amendment).

Watson's reliance upon *United States v. Sampol*, 636 F.2d 621, 630–42 (D.C.Cir. 1980), in which we said that the informant was a government agent regardless of when the Government first became aware of his discussions with the defendant, is misplaced. The informant in *Sampol* had been "accepted by the government as an informant at large whose reports about any criminal activity would be gratefully received"; "the government trolled in the jail, using [him] as bait, and was ready to net any unwary inmate who rose to the lure." *Id.* at 638. The case before us is a very different kettle of fish. Young was in jail solely because of his own misadventure; he was not there in order to gain information about Watson or any other prisoner, and he was neither instructed nor authorized to do so. Surely he hoped to gain or he would not have troubled himself even to listen to Watson, but the initiative was his, and he received no encouragement from the Government in pursuing it.

As for Watson's related claim that Young posed as a lawyer, no discussion is necessary; even if it were relevant once it is established that Young was a lone ranger, we would not be impressed because Watson points to no evidence to support that contention. Thus, we affirm the trial court's decision to allow Young to testify about his jailhouse conversations with Watson.

## B. *The Incident at Watson's Garage*

The trial court concluded that because Watson claimed that the cocaine found in his train compartment was put there by someone else, and disclaimed any involvement whatsoever with drugs, the evidence of drugs at the auto body shop was admissible as bearing upon his knowledge and his intent with respect to the cocaine in the company of which he was arrested. Federal Rule of Evidence 404(b) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as

proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Contrary to Watson's claim, this rule does not automatically bar evidence of a bad act that occurred subsequent to the crime charged. *See, e.g., United States v. Manner,* 887 F.2d 317, 321–22 (D.C.Cir. 1989). The temporal (as well as the logical) relationship between a defendant's later act and his earlier state of mind attenuates the relevance of such proof, however. As we explained in *United States v. Childs,* 598 F.2d 169, 174 (1979), later acts are most likely to show the accused's intent when "they are fairly recent and in some significant way connected with prior material events." *See also United States v. Gallo,* 543 F.2d 361, 365 (D.C.Cir.1976).

Although the incident at Watson's garage is perhaps less probative of intent than were the subsequent events in *Childs* and *Gallo,* we cannot say that it surpassed the limits allowed by Rule 404(b). Only recently, in *Manner,* we held that evidence of the defendant's selling drugs ten weeks after the possession with the intent to distribute cocaine for which he was tried, "met the relevance standard of Rule 404(b)." 887 F.2d at 322. Here, about three months separated the subsequent incident involving cocaine, at Watson's garage, from the possession of cocaine with intent to distribute for which Watson was tried. The close relationship between the acts to which Young testified and the actus reus alleged in the indictment, together with their reasonably close placement in time, is sufficient to satisfy the requirements of Rule 404(b). More specifically, Young's testimony surely bore upon the probability that Watson had no knowledge of the cocaine distribution business and did not intend to sell drugs at the time of his arrest. Its relevance is even more obvious when one recalls Watson's assertion that the drugs found in the train compartment did not belong to him and his negative responses during direct examination to the questions, "Are you involved with cocaine in any way?" and "Are you involved with drugs in any way?" The trial court did not abuse its discretion in reasoning that these claims raised the issue of Watson's intent and knowledge, and that testimony about the incident at his family's garage directly related to that issue, and in concluding that it was therefore admissible under Rule 404(b). *Cf. United States v. Eaton,* 808 F.2d 72, 75–76 (D.C.Cir.1987) (defendant's testimony that "he was unfamiliar with drugs" gave the Government the "right to rebut that evidence through cross-examination" about other "bad acts").

C. *The Timing of a Request for an Instruction on Character Evidence*

 The Government concedes that a court must instruct the jury on character evidence (if, as here, there is such) when the defendant makes a timely request. The issue presently before us is therefore a narrow one: whether the trial court properly refused to give that instruction where the defendant did not request it until after closing arguments and the other jury instructions had been given.

Federal Rule of Criminal Procedure 30 states in relevant part:

At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests.... The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury.

The rule clearly requires the defendant to propose jury instructions before closing argument. *See, e.g., United States v. Hernandez,* 730 F.2d 895, 900 (2d Cir.1984).

Watson suggests that once the court exercised its discretion by asking the parties, after closing arguments and the agreed-upon instructions, whether they had any additional requests, it was somehow bound to grant any such request. He cites no authority for this proposition, however, apart from a case in which the Supreme Court, if indeed it reached the precise point at issue here—and it may charitably be read not to have gone so far—said nothing to comfort the defense. *See Life Insur-*

*ance Co. v. Francisco,* 84 U.S. (17 Wall) 672, 679, 21 L.Ed. 698 (1873) ("No doubt a court may, notwithstanding the rule, in its discretion, receive prayers for instructions even after the general charge has been given to the jury, but neither party can claim as a right a disregard of the ordinary rules of practice in the court.").

As there is no reason to think that a court "waives" the requirements of Rule 30 by asking the defendant if he has any last request for a jury instruction, we think it is within the trial court's sound discretion whether to honor such a request. Absent abuse of that discretion so as to amount to "plain error," we will not overturn the trial court's decision; in effect, we must treat the defendant's point as the belated point it is, notwithstanding the trial court's invitation and rejection, as if he were raising it for the first time on appeal. *Cf. United States v. Debango,* 780 F.2d 81, 84 (D.C. Cir.1986) ("Appellant ... did not object to the instructions below and consequently must demonstrate plain error."); *United States v. Douglas,* 818 F.2d 1317, 1320 (7th Cir.1987) ("Failure to meet the requirements of Rule 30 means that this court will analyze a defendant's objections on appeal under a 'plain error' standard.").

We do not reverse a conviction for plain error unless the error is so substantial that "it affects the very integrity of the trial process." *United States v. Blackwell,* 694 F.2d 1325, 1341 (D.C.Cir.1982). That can be the case only "when the weakness of the evidence against defendant indicates that a serious injustice was done or when there are errors that 'seriously affect the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Baker,* 693 F.2d 183, 187 (D.C.Cir.1982) (*quoting United States v. Brown,* 634 F.2d 819, 829 (5th Cir.1981)); *see also United States v. Reed,* 476 F.2d 1145, 1147 n. 1 (D.C.Cir.1973) (failure to give character evidence instruction implicated no substantial rights "in the light of the strong proofs of guilt adduced by the prosecution and the insubstantial character of the character testimony").

In this case the district court's refusal to give the late-requested instruction on character evidence could not constitute plain error in light of the strong evidence against the defendant. Recall that Watson was the lone occupant of a train compartment in which the police found a commercial quantity—indeed, more than a kilogram—of cocaine, and that he later admitted to a fellow inmate that he had been bringing the cocaine back from Miami when he was caught. We can hardly conclude, therefore, that the omission of the instruction "probably changed the outcome of the trial." *Douglas,* 818 F.2d at 1320.

### III. CONCLUSION

Watson's other claims lack any merit and warrant no discussion.* Consequently, his conviction is

*Affirmed.*

---

* Our dissenting colleague maintains that Watson's sixth amendment right to counsel, as explicated in *Massiah,* was violated during his postindictment encounter with Young at the garage. It would be quite inappropriate for the court to address this issue. Regardless of whether Watson asserted at trial that the introduction of Young's testimony about the incident at the garage violated his rights under *Massiah,* he has failed to raise that issue on appeal. Watson's only *Massiah* claim relates to his jailhouse conversation with Young; his only objection to the garage incident is that it violates Rule 404(b). Indeed, when given the opportunity at oral argument, Watson's counsel declined to make the point now so warmly pressed on his behalf in the dissent.

> The Court: Did the objection to his, to Young's testimony rest in any part on the Philadelphia encounter where he was more clearly, could be portrayed as a government agent?
> Appellant: Well, there were two objections to his testimony. One involved the 404(b) nature of his testimony, and the other involved, which involved the incident in Philadelphia. The other involved the *Massiah* incident, or what we allege to be the *Massiah* incident, that occurred in the D.C. jail.

The unwisdom of addressing an issue that Watson does not raise on appeal is increased by the novelty of that issue in this circuit. The Supreme Court held in *Maine v. Moulton,* 474 U.S. 159, 180, 106 S.Ct. 477, 489, 88 L.Ed.2d 481 (1985), that "incriminating statements pertaining to pending charges are inadmissible at the trial of those charges" when the Government "knowingly circumvent[s] the accused's right to the assistance of counsel." There is a genuine

MIKVA, Circuit Judge, dissenting:

If the relatively simple issues addressed by the majority opinion were all that this case involved, I would certainly concur. But the relative simplicity of that opinion is purchased at the expense of addressing appellant's constitutional right to counsel, a claim that the majority inexplicably ignores. Watson claims that his sixth amendment rights were violated when evidence, obtained by an acknowledged government agent after charges attached, was used in his then-pending prosecution. The record bears him out, and our precedents make it clear that this action by the government deprived Watson of effective assistance of counsel. I think appellant is entitled to a new trial because such evidence should have been excluded.

The majority's discussion of the sixth amendment right to counsel fails to confront this problem. The majority correctly points out that the witness who provided the tainted evidence, Mr. Young, was not a government agent at the time he shared a jail cell with appellant. It is also true that Young had not been placed in the cell to obtain information from Watson, nor was he an "informant at large" who had been instructed to "troll the jail cells" eliciting information indiscriminately. Although Young had been, and currently was, a paid government *informant* at the time he shared a cell with Watson, Young's placement in the cell was simply coincidence. The statements made by Watson while in the jail cell, as the majority explains, did not implicate government action and could be admitted without violating the sixth amendment.

But that very analysis demonstrates why Young *was* an agent during his post-release discussions with Watson and why the testimony as to those post-release discussions was inadmissible. The majority conveniently fails to mention the dramatic change in Young's status at the time of his visit to Watson's home to discuss a proposed drug deal. DEA Special Agent Gray testified that while Young was in jail, he suggested to Young that Young begin to "make a case" on Watson *after their release.* Young testified that he did so; he contacted Watson at his home and he gathered evidence (possession of cocaine) which was later introduced at Watson's trial in *this* case.

The Supreme Court's decisions leave no doubt that Watson was a government agent at this second meeting. Once the government forms an agreement with an individual to elicit incriminating information from a criminal suspect, an agency relationship has been created. *See, e.g., Henry v. United States,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986); *United States v. Sampol,* 636 F.2d 621 (D.C.Cir.1980). Indeed, in the Supreme Court's seminal case on this issue, *Henry v. United States,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115, the Court found that an agency agreement was formed even though the police expressly *prohibited* the informant from questioning the defendant because the police nevertheless created incentives for the informant to ignore that prohibition. The evidence of agency here could not be more compelling; the DEA agent instructed Young to "make a case."

As the Supreme Court has explained, the Constitution requires exclusion of any incriminating statements deliberately elicited by the government after a defendant has been indicted. *Massiah v. United States,* 377 U.S. 201, 205, 84 S.Ct. 1199, 1202, 12 L.Ed.2d 246 (1964). *Massiah* recognized the fundamental right of defendants to lawyers' help at all critical stages of prosecution beginning at the indictment. It

---

issue whether the evidence obtained at Watson's garage, which was introduced only in order to show motive and intent, "pertain[s] to the pending charges" within the meaning of *Moulton.* The courts to which it has been presented have divided on this question. Compare *United States v. Anderson,* 523 F.2d 1192 (5th Cir.1975) (reversing conviction) with *United States v. Mos-*

*chiano,* 695 F.2d 236 (7th Cir.1982) (affirming conviction) and *Mealer v. Jones,* 741 F.2d 1451, 1453 n. 1 (2d Cir.1984) (finding a *Massiah* violation, but suggesting in dictum that it would not do so on the facts of this case). None of these cases is cited or discussed in either of appellant's briefs nor, of course, did the Government address an issue not raised against it.

would, as the Court explained, be patently illogical to raise the right to counsel as a bar to government attempts to interrogate a suspect only when it is done forthrightly, but not when it is done through confederates in a sneaky fashion. "'Any secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with a crime.'" *Id.* (*quoting People v. Waterman,* 9 N.Y.2d 561, 565, 216 N.Y.S.2d 70, 175 N.E.2d 445 (1962)). Although it is entirely proper to continue an investigation of a defendant's suspected criminal activities after he has been indicted, incriminating statements covertly obtained by government agents "[can] not constitutionally be used by the prosecution as evidence against him at his trial." *Id.* 377 U.S. at 207, 84 S.Ct. at 1203. As the majority acknowledges, the locus of the discussions does not alter our analysis. A government agent can violate a defendant's constitutional right to counsel just as effectively on the street as in jail. *Maine v. Moulton,* 474 U.S. 159, 177 n. 13, 106 S.Ct. 477, 177 n. 13, 88 L.Ed.2d 481 (1986).

The majority's failure seriously to treat this problem rests on two very thin reeds. First, the majority tries to construct a waiver of appellant's claim because he either failed to raise it at trial or abandoned it on appeal. That is not what happened.

Watson specifically raised a sixth amendment objection to all of Young's testimony at trial. His counsel specifically stated, "I would move to exclude Mr. Young's testimony.... One basis would be, your Honor, that it violates my client's Sixth Amendment right to counsel by having him testify, for reasons that I previously mentioned to the Court." Tr. 323; *see also* tr. 274, 275, 284. The trial court clarified that the *Massiah* issue went to the *post-release* conversations which occurred after Young had been instructed to make a case against Watson. Tr. 269, 271. As we noted in *United States v. Johnson,* 802 F.2d 1459, 1465 n. 14 (D.C.Cir.1986), to preserve a claim for appeal, an objection need only be

"adequate to draw the trial court's attention to the ... problem." Here, Watson drew the court's attention directly to the problem: the sixth amendment prohibition against Young's testimony.

Watson renewed his sixth amendment challenge on appeal. It is true that appellant's brief focused upon the least protected portion of Young's testimony—namely those statements made while Watson and Young were in jail. Nevertheless, the sixth amendment problems with the other aspects of Young's testimony were abundantly clear to this Court and consumed the majority of its attention at oral argument. In response to this Court's questioning, appellant's counsel repeatedly maintained that Young was an agent of the government at the time of the Philadelphia encounter. Even in response to a complex question at the end of oral argument, counsel affirmed that the post-release encounter did form part of the basis for his objections on appeal. *Ante* at 1350. That his answer was no more precise than the question posed can hardly be deemed evidence of waiver. To claim now that Watson's inartful briefing somehow waived his legal objections is disingenuous.

The majority's second basis for declining to address Watson's claim stems from its view that the issue raised is somehow novel. I do not think it novel at all. Young's statements regarding his conversation with Watson after Young had become a government agent are clearly inadmissible. *Massiah* is uncompromising: the State may not introduce incriminating statements deliberately elicited by the government after charges have been filed in a proceeding on that offense. It makes no difference that Young originally elicited Watson's statements for use in a separate proceeding or that they were probative of a separate crime. In *Maine v. Moulton,* 474 U.S. 159, 180, 106 S.Ct. 477, 489, 88 L.Ed.2d 481 (1985), the Supreme Court stated that

incriminating statements pertaining to pending charges are inadmissible at the trial of those charges, notwithstanding the fact that the police were investigating other crimes, if, in obtaining the evi-

dence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel.... [T]he fact that the police had additional reasons for recording [defendant's statements] ... is irrelevant.

Regardless of the government's motives, the statements elicited here directly pertained to the charges which were then pending against Mr. Watson. The incriminating statements elicited from the defendant were used to rebut Watson's claim that he did not intentionally possess drugs and were introduced to establish intent, one element of the crime of "possession with intent to distribute." As the Fifth Circuit cogently observed, "conviction require[s] proof of both actus rea and mens rea elements of the indicated offenses. Evidence obtained from the government's surreptitious confrontation with defendant is no less incriminating because it tends to prove criminal intent rather than criminal act." *United States v. Anderson,* 523 F.2d 1192, 1196 (2d Cir.1975).

To restrict the words "pertaining to" to mean only statements involving the same physical act for which the defendant is charged is not only logically unsound but also is contrary to the prophylactic purposes expressed in *Massiah.* To permit the introduction of probative admissions in these cases would encourage the government to pursue pretextual investigations in order to collect evidence that, cumulatively, would tend to prove intent, motive, habit, or any of many other factors going to an element of the original offense whenever *Massiah* bars them from collecting this evidence directly. This would neither serve the purposes of *Massiah* nor ultimately enhance the state's interest in crime-fighting. The state already can introduce incriminating statements relating to new crimes in proceedings *on the new crimes. Moran v. Burbine,* 475 U.S. 412, 431, 106 S.Ct. 1135, 1146, 89 L.Ed.2d 410 (1986). If the State wishes to make a separate case, it is free to do so, as long as it keeps that case separate and does not use such incriminating evidence acquired by a government agent from the defendant in the first proceeding after charges are brought.

The issue so readily ignored by the court today is not some new invention of constitutional law. Even before *Moulton* was decided, the Supreme Court summarily reversed a conviction on *Massiah* grounds in almost identical circumstances where the court admitted statements that were probative of the indicted offense even though they concerned—and were made in the course of—an investigation into separate crimes. *Beatty v. United States,* 389 U.S. 45, 88 S.Ct. 234, 19 L.Ed.2d 48 (1967). In *Beatty,* the suspect's incriminating statements offering to negotiate the sale of handguns and to suborn perjury were introduced at his pending trial for previous, illegal handgun sales. The Court reversed despite the fact that the statements referred to a separate offense that was merely probative of the pending charge. *Moulton* merely confirmed what several circuits reading *Massiah* and *Beatty* had already divined. *See, e.g., Mealer v. Jones,* 741 F.2d 1451 (2nd Cir.1984); *United States v. Anderson,* 523 F.2d 1192 (5th Cir.1975).

After *Moulton* this court's duty to reverse is clear. "Knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity." *Moulton,* 474 U.S. at 176, 106 S.Ct. at 487. If an informant has been enlisted by the state and attempts to introduce incriminating statements in the first proceeding (regardless of the motive for collecting or introducing these statements), the statements must be ruled inadmissible. *See, e.g., U.S. v. Nocella,* 849 F.2d 33, 37 (1st Cir.1988) (use of defendants' "new crime" admission in connection with an earlier charge would "clearly be prohibited.").

Because Young was instructed by the DEA to "make a case" against Watson after Watson's sixth amendment rights had attached, and because Young subsequently elicited statements by Watson that he sold and knowingly possessed drugs, *Moulton* precludes use of this testimony at trial. That the majority shies away from this

result reveals only that the sixth amendment is an inconvenient doctrine for the government and the bench alike. It would certainly be easier for law enforcement officials if they could conjure the spirit of fear and remorse in a suspect by issuing indictments and then exorcise and record the suspect's secret thoughts by planting attentive specters around him. The Constitution's standing requirement that attorneys be invited to this mystical ritual no doubt introduces an unwelcome fly in the prosecution's potion. Likewise, judicial decisions would certainly be easier to write if we could blithely ignore those issues that unsettle the flow of justice or require difficult choices. However, there is no "convenience exception" buried within the sixth amendment. We twist the letter and the spirit of the Bill of Rights by requiring some specific chant to be made before a constitutional claim is deemed to be raised. I dissent.