**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Edward B. BETTS, Randy J. Lane, and Judy K. Lane, Defendants– Appellants.**

Nos. 92–2864–92–2866.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 22, 1993.

Decided Feb. 15, 1994.

---

Ralph M. Friederich, Asst. U.S. Atty., Suzanne M. Wissmann (argued), Office of the U.S. Atty., Criminal Div., Fairview Heights, IL, for U.S.

James L. Karraker (argued), Anna, IL, for Edward B. Betts.

William Arthur Schroeder, Southern Illinois University, School of Law, Carbondale, IL, for Randy J. Lane.

Mark D. Prince, Hughes & Associates, Carbondale, IL, for Judy K. Lane.

Before CUMMINGS, CUDAHY, and ILANA DIAMOND ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

A jury convicted defendants Edward Betts and Randy and Judy Lane of conspiring to distribute in excess of one hundred kilograms of marijuana. Betts and Randy Lane were each sentenced to 360 months in prison; Judy Lane was ordered to serve 120 months. On appeal, all three defendants challenge the admission of evidence pursuant to Fed. R.Evid. 404(b) concerning the discovery of sixteen pounds of marijuana and other items in the Lanes' home some eighteen to twenty-four months after the charged conspiracy ended. The Lanes also contend the search that produced these items was illegal and that the statements Randy Lane made at the time of the search were involuntary and obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Betts contends that he too was interrogated in violation of *Miranda*. In addition, he challenges the district court's refusal to depart downward to reduce the disparity between his sentence and the much shorter sentences imposed on two co-conspirators who were convicted separately. We affirm.

## I. FACTS

On August 3, 1990, officers belonging to the Southern Illinois Enforcement Group ("SIEG") executed a search warrant unrelated to this case and entered a room at the Marion Courts Motel in Marion, Illinois. Inside, they found Betts convulsing on the floor and summoned medical assistance. Three days later, Betts appeared at the Williamson County Sheriff's Department at the request of Agent James Webb. Webb apprised Betts of his *Miranda* rights, and after obtaining Betts' written waiver, proceeded to interview him. In the course of this interview, Betts revealed that he had made several trips to Texas at the behest of Alejandro "Alex" Vega to pick up marijuana in quantities of twenty pounds or more. Vega was the subject of an ongoing investigation by SIEG, and at the conclusion of the interview, Betts said he would be willing to answer further questions

about him. Webb then referred the matter to SIEG Agents Debra Otey and Dan Key.

Vega, it turned out, was the kingpin of an organization that had been distributing up to fifty pounds of marijuana per week throughout southern Illinois since 1987. Vega obtained the marijuana from Juan Flores, who lived in Houston, Texas. Over the life of the conspiracy, Flores supplied Vega with more than 500 pounds of marijuana, a quantity worth over half a million dollars on the street. To transport the marijuana from Houston to Illinois, Vega employed a number of couriers or "runners". Betts and Randy Lane were among these individuals, as was Betts' half-brother, Hubert Shelton. For distribution purposes, Vega also used a number of "stash houses." The Lanes' home was among them.

On September 11, 1990, Agents Otey and Key visited Betts at his mother's home hoping to interview him regarding Vega. Because Hubert Shelton had just died, Betts asked the officers to return at a later date. They did so two days later. Betts suggested that they conduct the interview somewhere more private than his mother's house. He indicated that the Sheriff's Department would be acceptable.

Otey and Key drove Betts to the Williamson County Sheriff's Department and interviewed him in the squad room. They did not advise Betts of his *Miranda* rights before doing so. The interview lasted approximately 90 minutes, during which time Betts was free to walk about the room, drink soda, and smoke. When the interview was finished, the officers drove Betts home, and he agreed to speak with them again if necessary. According to Otey, the officers did not suspect Betts of being involved with Vega prior to the interview, although Betts had already admitted as much to Webb. However, in the course of the interview, Betts confirmed that he had made approximately twenty trips to Texas on Vega's behalf between January and April of 1989 either to take cash to Flores or to obtain marijuana from him.

On January 29, 1992, a grand jury returned an indictment alleging that the defendants had conspired with Vega and others to distribute and to possess with the intent

distribute more than 100 kilograms of marijuana. The indictment was suppressed until the defendants were taken into custody.

Shortly after 7:00 a.m. on February 3, 1992, four officers and two interns arrived at the Lanes' home to execute a warrant for their arrest. After Judy Lane admitted the officers into the house, the officers advised the Lanes that they were under arrest, handcuffed them, and apprised them of their *Miranda* rights. At that point, Mrs. Lane asked to speak with the officers in private, and they agreed. During their conversation, they asked her whether she would consent to a search of the house. She refused, but indicated that she would consent if her husband did. The officers then approached Mr. Lane, who agreed to the search and signed a consent form. According to the officers, when they asked Mr. Lane where "the drugs" were, he replied: "Come on. They're down in the basement in the deep freezer." Lane Suppr.Tr. 50.

Sixteen pounds of marijuana were found in the Lanes' deep freezer. Elsewhere in the house, the agents discovered a duffel bag with traces of marijuana inside, a set of digital scales found together with a quantity of "Ziploc" baggies in a laundry basket, and an address book and various scraps of paper containing names, addresses, and phone numbers linked to the Lanes' alleged co-conspirators.

In advance of trial, the Lanes moved to suppress the evidence seized from their home, contending that Randy Lane's consent to the search was involuntary. Randy also contended that the statements he made to the police on the day of his arrest were obtained without an adequate admonishment and waiver of his *Miranda* rights. Betts likewise moved to suppress the statements he had made to Key and Otey on September 13, 1990, contending that the interview amounted to custodial interrogation conducted without the requisite *Miranda* warnings. After evidentiary hearings, the district court denied the motions.

At trial, Agent Otey recounted the substance of the September 13, 1990 interview,

in which Betts had disclosed his role as a courier for Vega in 1989. The government also offered at trial the evidence seized from the Lanes' home, invoking Fed.R.Evid. 404(b). The district court admitted the evidence over the defendants' objection, advising the jury to consider the evidence solely with respect to the knowledge and intent of the Lanes. The jury subsequently found all three defendants guilty.

At sentencing, Betts moved for a downward departure on the ground that the minimum sentence of 360 months called for under the career offender provision of the Sentencing Guidelines was disproportionate to the sentences his co-conspirators Vega and Flores had received. Vega and Flores had been charged separately, and after pleading guilty, they had ultimately received sentences of 144 and sixty months, respectively.[1] The district court denied the motion and sentenced Betts to the minimum term of 360 months.

## II. ANALYSIS

### A. Legality of the Search of the Lane Residence

At trial, Philip K. Sylvester of the Illinois State Police testified that he was one of the individuals who had searched the Lanes' home at the time of their arrest. He identified the set of digital electronic scales as well as some Ziploc baggies. Johnson County Sheriff Elry Louis Faulkner, who also had participated in the search, identified the remaining items that were seized, including the sixteen pounds of marijuana, the duffel bag with marijuana residue, and documentary items referring to the Lanes' alleged co-conspirators. The Lanes argue that this evidence was improperly admitted under Rule 404(b), but we first consider their contention that the evidence was seized in violation of their Fourth and Fourteenth Amendment rights.

As we have noted, the marijuana and other items were seized from the Lanes' home in conjunction with their arrest on February 3,

---

1. Vega was initially sentenced to 240 months in prison, but based on his cooperation with the government, the sentence was subsequently reduced to 144 months.

1992. The arresting officers did not have a search warrant, and the government relies solely on Randy Lane's consent to justify the search.[2] The Lanes contend that Randy's consent was the product of coercion, and Judy Lane argues that even if her husband's consent suffices to render the seized evidence admissible against him, it is insufficient as to her because she had previously refused permission to search the house.

Randy Lane admitted at the suppression hearing that he had consented to the search of his home (Lane Suppr.Tr. 91, 95), and prior to the search he had signed a written consent form. Gov.Ex. 1, Lane Suppr.Hrg. He also acknowledged that after giving his consent, he had led officers to the freezer in the basement, where the sixteen pounds of marijuana were stored. Lane Suppr.Tr. 102. The Lanes nonetheless contend that Randy's consent was not freely given, because (1) he was confused, disoriented, and already in custody, (2) he did not realize that he had a right to refuse, and (3) the search was already underway by the time his consent was solicited and he did not think he could stop it even if he wished to.

We recently summarized the rules applicable to consent searches in *United States v. Duran:*

> Consent searches are valid only if the consent was freely and voluntarily given. [*Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973).] The question of whether a consent was voluntary, as opposed to the product of duress or coercion, "is a question of fact to be determined from the totality of the circumstances." *Id.* at 227, 92 S.Ct. at 2048. The government bears the burden of proving voluntariness by a preponderance of the evidence, *id.* at 222, 93 S.Ct. at 2045; *United States v. Lechuga,* 925 F.2d 1035, 1041 (7th Cir.1991), and we will not reverse a district court's finding on this issue unless clearly erroneous. *United States v. Talkington,* 843 F.2d 1041, 1047 (7th Cir.1988); *accord United States v. Battista,* 876 F.2d 201, 207 (D.C.Cir.1989); *United States v. Arango–Correa,* 851 F.2d 54, 57 (2d Cir.1988).

957 F.2d 499, 502 (7th Cir.1992). *See also United States v. White,* 979 F.2d 539, 542 (7th Cir.1992).

■ In this case, the totality of the circumstances supports the district court's finding that Randy's consent to the search was voluntarily obtained. Randy not only admitted having given his oral consent, but signed a written consent form acknowledging that "no promises, threats, force, or physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search ... or to sign this form." Gov. Ex. 1, Lane Suppr. Hrg. After signing the form, Randy also, without hesitation, led the officers to the basement freezer containing the marijuana. There is no evidence or allegation that he did any of this under force or threat.

Of course, Randy was already under arrest by the time he consented to the search—by all accounts, he and his wife were arrested and handcuffed almost immediately after they admitted the officers into their home. That fact is relevant to the question of voluntariness, but it is not dispositive, so long as "[t]he potentially coercive effect of [his] custody ... was mitigated by the circumstances." *Duran,* 957 F.2d at 503. That is the case here. Randy gave his consent in the familiar surroundings of his own home. Although the arrest took place early in the day, and the Lanes appear to have been roused from their sleep by the officers' arrival, nothing in the record suggests that Randy was not fully awake by the time his consent was solicited. After the officers first knocked on the door of the Lane residence, they waited several minutes before entering at Judy's request. Moreover, they solicited Judy's consent before approaching Randy. In the interim, while Sheriff Faulkner and

---

2. *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), permits the police to conduct a limited search of the arrestee and the area within his or her immediate control. Likewise, *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), allows officers arresting an individual in his or her home to search areas where someone might be hiding. However, the government does not resort to either of these cases as support for the search at issue here.

Special Agent John Yacup of the Drug Enforcement Administration spoke with Judy in the bedroom, Randy was permitted to smoke and have a soda. By all accounts, although he was somewhat upset when the officers arrived, he was calm and rational throughout the encounter. Finally, there is no indication that despite the early hour, Randy did not comprehend the nature of the officers' request and the ramifications of his consent. To the contrary, his willingness to lead the officers to the marijuana in the basement suggests that he simply deemed it prudent to cooperate.

■ Randy's contention that he did not realize he had a right to refuse his consent does not detract from our conclusion. "The lack of a warning does not prove that consent was involuntary; it is simply another factor to be considered in the totality of the circumstances." *White,* 979 F.2d at 542 (internal quotation marks omitted). In any case, the consent form that Randy signed expressly acknowledged: "I understand that I have the right to refuse to consent to the search described above and to refuse to sign this form." Gov.Ex. 1, Lane Suppr. Hearing. Special Agent Yacup testified that he had explained the form line by line to Lane and that Lane had indicated he understood it. Lane Suppr.Tr. 63. Lane himself admitted that he had read the form before signing it. Lane Suppr.Tr. 91. As we noted in *Duran,* an admonishment that the defendant was entitled to withhold his consent "put [him] on par with the experienced arrestee in terms of what [he] really needed to know under the circumstances." 957 F.2d at 502. It is also significant that this was not the first time Randy had been arrested. Indeed, as the district court noted, not only had he been arrested some six or seven times before, but on one of those occasions he had consented to the search of his automobile, where marijuana was discovered. Lane Suppr.Tr. 140; *see also id.* at 105–08. Even if we indulge in the somewhat dubious assumption that despite all of this, Randy did not realize he had a right to withhold his consent, we need not conclude that his consent was involuntary, for the police were not constitutionally required to advise Randy that he had the right to refuse a search before procuring his consent. *Schneckloth,* 412 U.S. at 231, 93 S.Ct. at 2049–50; *White,* 979 F.2d at 542. Given the other circumstances tending to show that Randy's consent was freely given, his purported failure to understand his right to refuse is not dispositive.

■ As further evidence of coercion, the Lanes point to Randy's testimony that the officers had already begun their search of the house by the time they solicited Randy's consent:

Q. You thought if you didn't sign the form, no search would be conducted?

A. Yes.

Q. So you signed the form so that a search would be conducted?

A. No. Well, they were searching my home anyway, but I didn't—I didn't think it was legal, you know, for them to go ahead and search my house without a consent. Since they were already doing.

Q. Why did you sign the written consent form?

A. I kind of figured for my family. I mean everything was happening so fast, I was kind of mentally disoriented, and my wife was hysterical, and I was just kind of scared.

Q. And you didn't know you had the right to refuse?

A. No, not really.

Lane Suppr.Tr. 94–95. The arresting officers told quite a different story, testifying that they refrained from any search until Randy gave his consent. Lane Suppr.Tr. 19, 49, 75. Were it true that the officers were already in the midst of a search before obtaining a consent, the validity of Randy's consent might be questioned. However, the district judge, after hearing the conflicting accounts of what transpired, clearly credited the officers' account:

There is obviously some substantial contradiction in [the] testimony of the witnesses here. . . .

.    .    .    .    .

The officers, I believe, conducted themselves in a proper fashion. The story that Mr. Lane testified to just, I agree with the

government, doesn't quite add up. He, on the one hand, says that the people were ransacking the house before he signed the consent, and then yet after he signed the consent, he admits that he took them down to the basement to find the marijuana in the deep freeze. I don't fully understand that and don't fully understand his explanation of why he did eventually sign the consent.

The other thing that mitigates substantially against Mr. Lane and Mrs. Lane both, for that matter, is that they're both not strangers to difficulty. According to my calculation, Mr. Lane has been convicted on three former occasions, arrested three more. He's been under arrest at least six or seven times. One time he also consented to a search involving possession of cannabis. I think he clearly knew what he was doing. I don't see any overreaching here of the law enforcement officials in this case.

... I feel that based on these observations, based on the testimony of the police officers, that this was a valid search pursuant to a consent. That there was no coercion, no intimidation, nor other physical or mental coercion involved of any kind. There was no overreaching by the officers involved, and consequently, the motion to suppress ... is hereby denied.

Lane Suppr.Tr. 139–41. The district court's findings in this regard rested on his assessment of the credibility of the witnesses. Absent some showing that the testimony he credited was *"exceedingly* improbable," we defer to that assessment. *United States v. Cardona–Rivera,* 904 F.2d 1149, 1152 (7th Cir.1990) (emphasis in original). No such showing has been made here. We therefore accept the district court's determination that the officers postponed their search until Randy's consent was obtained.[3]

■ The Lanes point out that although the consent form Randy signed expressly authorized only Special Agent Yacup and Sergeant Sylvester to conduct the search, there were two other officers and two interns present at the scene, and the record confirms that at least one of them (Sheriff Faulkner) participated in the search. But contrary to the Lanes' suggestion, this omission does not invalidate the search. The Lanes do not contend that they were under any misapprehension that only Yacup and Sylvester would conduct the search. Indeed, all of the other officers and interns were present in the home when Randy signed the consent form, and the Lanes do not contend that they tried to restrict the number of officers who would participate. Insofar as the record reflects, the failure to list any of the others on the consent form was due solely to the fact that there were only two blanks on the form for this purpose. Finally, the Lanes do not identify any specific prejudice resulting from the participation of the other officers in the search. We note that in similar circumstances, the Ninth Circuit has rejected the very contention that the Lanes make here:

> We are unpersuaded that a consent search may be validly qualified by the number of officers allowed to search, and we so hold. Once consent has been obtained from one with authority to give it, any expectation of privacy has been lost. We seriously doubt that the entry of additional officers would further diminish the consenter's expectation of privacy.... *Cf. United States v. White,* 617 F.2d 1131, 1134 (5th Cir.1980) (motion to suppress denied because delay in search and search by agents not named in consent form were not related to the scope of the search).

*United States v. Rubio,* 727 F.2d 786, 797 (9th Cir.1983); *accord Wildauer v. Frederick County,* 993 F.2d 369, 372 (4th Cir.1993). We likewise conclude that under the circumstances before us, there was no Fourth Amendment interest violated by the participation of officers other than those listed on the consent form.

■ We arrive finally at Judy Lane's contention that the items seized during the

---

**3.** Mr. Lane has suggested that in order to obtain his consent, the officers promised that no charges would be filed based on anything they discovered during the search. However, Special Agent Yacup explicitly denied making any such promise to Lane, Lane Suppr.Tr. 60, and the consent form that Randy signed acknowledged that his consent was not the product of any promises, *id.* Gov. Ex. 1.

search could not be admitted against her in light of the fact that she withheld her consent. At the outset, we note that according to Special Agent Yacup, Judy indicated she would consent if her husband did. Thus, it is not at all clear, given Randy's subsequent decision to permit the search, that Judy ultimately withheld her consent. In any event, as we noted in *Duran:*

> It is well established that "the consent of one who possesses common authority over [the] premises ... is valid as against the ... nonconsenting person with whom that authority is shared." *United States v. Matlock,* 415 U.S. 164, 170, 171 n. 7 [94 S.Ct. 988, 993 n. 7, 39 L.Ed.2d 242] (1974).... [C]ommon authority rests "on mutual use of the property by persons generally having joint access of control for most purposes."

957 F.2d at 503. In this case, it is undisputed that the Lanes lived together, implicating the presumption that "one spouse has the authority to consent to a search of a premises jointly occupied by both spouses." *Id.;* *see also id.* at 505. And although we have left open the possibility that one spouse might maintain exclusive control over discrete portions of a common homestead and thereby retain the sole right to authorize a search of such areas, *id.* at 504–05, here, there is no hint in either the record or the Lanes' brief that Randy lacked access to any portion of the Lane residence. It is the defendant's burden to rebut the presumption of joint control by making such a showing, *id.* at 505, and because the Lanes have not done so, we conclude that Randy's consent sufficed to render the evidence seized admissible against Judy as well as him.

### B. Admission of Marijuana and Other Evidence Seized from the Lane Home

The district court admitted the evidence concerning the marijuana, electronic scales, duffel bag, and other items seized from the Lanes' home pursuant to Fed.R.Evid. 404(b), for the purpose of establishing the Lanes' knowledge and intent with respect to the charged conspiracy. As with other evidentiary rulings, we review that decision for abuse of discretion. *United States v. McCarthur,* 6 F.3d 1270, 1279 (7th Cir.1993).

Although Rule 404(b) precludes the admission of evidence concerning the defendant's "other crimes, wrongs, or acts" in order to establish his propensity to commit the offense charged, it does allow such evidence to be admitted for a variety of other purposes. Fed.R.Evid. 404(b). Before admitting the evidence for one or more of these purposes, however, the district court must be satisfied that it satisfies each of four conditions:

> "(1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice."

*United States v. Levy,* 955 F.2d 1098, 1102 (7th Cir.1992) (quoting *United States v. Zapata,* 871 F.2d 616, 620 (7th Cir.1989)), *cert. denied,* —— U.S. ——, 113 S.Ct. 102, 121 L.Ed.2d 62 (1992). The Lanes contend that the evidence seized from their home failed each of these conditions, but we confine our consideration to whether the marijuana and other items were in fact probative of the Lanes' knowledge and intent. Because these items were seized at least eighteen months after the charged conspiracy ended, we agree that they were not.

■ Before we consider the marijuana and related paraphernalia, an initial word is in order regarding the documents reflecting names and other information regarding the Lanes' co-conspirators. These included (1) a piece of paper bearing the name and address of Rosa Nilda Flores, Juan's wife; (2) an address book containing the name "Alex" with a telephone number assigned to a pager, the name "Juan" and two telephone numbers, telephone numbers for Southwest Airlines, TWA, and Greyhound (including numbers for Southwest and TWA in Houston), and some flight scheduling information; and (3) a note appearing to list the criminal charges pend-

ing against Juan Flores,[4] the witnesses against him (including Betts and Hubert Shelton), and information regarding Flores' attorneys. Although the Lanes lump these items together with the other evidence admitted under Rule 404(b), these documents were not evidence of the Lanes' "other acts," but rather circumstantial proof of the very conspiracy with which they were charged. The references to the Lanes' alleged co-conspirators tended to show a familiarity and association with them, and thus were probative of whether the Lanes were members of the conspiracy. *See United States v. McGlory,* 968 F.2d 309, 333 (3d Cir.1992) (collecting cases), *cert. denied,* — U.S. —, —, 113 S.Ct. 415, 627, 121 L.Ed.2d 339 (1992), and — U.S. —, 113 S.Ct. 1388, 122 L.Ed.2d 763 (1993). The telephone numbers for the airline and bus companies were similarly probative, in that they corroborated testimony that Randy Lane had made trips to and from Houston by air or by bus as a courier for Vega. The fact that such evidence was found after the time frame of the conspiracy does not necessarily lessen its probative force; it still demonstrated a link with the defendants' co-conspirators[5] and suggested (in the case of the telephone numbers) conduct consistent with the conspiracy.

■ That said, we turn to the marijuana and related items. Rule 404(b), of course, does not restrict evidence concerning the defendant's "other acts" to events which took place *before* the alleged crime; "[b]y its very terms, 404(b) does not distinguish between 'prior' and 'subsequent' acts." *United States v. Bibo–Rodriguez,* 922 F.2d 1398, 1400 (9th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 2861, 115 L.Ed.2d 1028 (1991); *see also United States v. Beasley,* 809 F.2d 1273, 1278 (7th Cir.1987); *United States v. Brantley,* 786 F.2d 1322, 1329 (7th Cir.), *cert. denied,* 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986); 2 David W. Louisell and Christopher B. Mueller, *Federal Evidence* § 140, at 198 (1985). The critical question is whether the evidence is sufficiently probative of a matter within the rule's purview. Depending upon the factual circumstances, the chronological relationship of the charged offense and the other act may well have some bearing on this inquiry, *see United States v. Watson,* 894 F.2d 1345, 1349 (D.C.Cir.1990) but it is not necessarily dispositive, *United States v. Brown,* 923 F.2d 109, 111 (8th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 110, 116 L.Ed.2d 80 (1991); *United States v. Ramirez,* 894 F.2d 565, 569 (2d Cir.1990).

We hasten to add, however, that simply because evidence of a prior act is admissible under Rule 404(b) for a particular purpose does not mean that a similar but subsequent act is necessarily admissible for the same purpose. In narcotics cases, for example, prior drug transactions are frequently admissible for the light they shed on otherwise circumstantial proof of the defendant's involvement in narcotics distribution. The government's proof may establish that the defendant associated with his alleged co-conspirators, employed facially innocent code language, was observed in propinquity to narcotics, and possessed such hallmark paraphernalia as electronic scales, pagers, cellular telephones, and Ziploc baggies. Defendants can and often do posit that these circumstances are merely happenstance and that any involvement they may have had with narcotics distribution or dealers was unknowing and unintentional. *See United States v. Carson,* 9 F.3d 576, 587–88 (7th Cir.1993) (mere presence at the scene of illegal activity); *United States v. Paiz,* 905 F.2d 1014, 1020 (7th Cir.1990), *cert. denied,* 499 U.S. 924, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991) (mere association with co-conspirators); *United States v. Vega,* 860 F.2d 779, 795 (7th Cir.1988) (use of code language); *United States v. Foster,* 939 F.2d 445, 450–452 (7th Cir.1991) (use of tools of the trade). In that context, evidence of the defendant's prior transactions may be uniquely probative of the defendant's mindset. *See, e.g., United States v. Hernandez,* 896 F.2d 513, 522 (11th Cir.), *cert. denied,* 498 U.S. 858, 111 S.Ct.

---

**4.** Flores had been arrested in September 1990, and at trial he confirmed that after the arrest he spoke with Randy Lane about the charges pending against him. Flores Tr. 20.

**5.** Arguably, the set of electronic scales found in the Lanes' home established a similar link, because Vega identified the set as one that he had given the Lanes. Tr. 51–53, 249–54.

159, 112 L.Ed.2d 125 (1990); *United States v. Grizales,* 859 F.2d 442, 446 (7th Cir.1988); *United States v. Scott,* 767 F.2d 1308, 1311 (9th Cir.1985). Subsequent narcotics activity, on the other hand, particularly conduct that is substantially separated in time from the charged offense, is far less likely to illuminate the defendant's state of mind on an earlier occasion. *See United States v. Garcia–Rosa,* 876 F.2d 209, 221 (1st Cir.1989), *cert. denied,* 493 U.S. 1030, 110 S.Ct. 742, 107 L.Ed.2d 760 (1990), *vacated in part on other grounds,* 498 U.S. 954, 111 S.Ct. 377, 112 L.Ed.2d 391 (1990); *United States v. Lego,* 855 F.2d 542, 546 (8th Cir.1988); *United States v. Moschiano,* 695 F.2d 236, 244 (7th Cir.1982), *cert. denied,* 464 U.S. 831, 104 S.Ct. 110, 78 L.Ed.2d 111 (1983); *United States v. Jimenez,* 613 F.2d 1373, 1376 (5th Cir.1980). *See also United States v. Boyd,* 595 F.2d 120, 126 (3d Cir.1978) ("The logic of showing prior intent or knowledge by proof of subsequent activity escapes us."); *contra United States v. Hadaway,* 681 F.2d 214, 217 (4th Cir.1982).

■ In this case, we believe the discovery of marijuana and related paraphernalia in the Lanes home in February of 1992 had little or no probative worth in establishing the Lanes' knowledge and intent vis à vis the charged conspiracy. The trial evidence revealed that this conspiracy was at an end no later than August 1990, when Vega was arrested; and the government conceded as much. *See* Friederich Opening Statement Tr. 2; Tr. 490–91. Indeed, Vega testified that he had

stopped distributing marijuana altogether by February 1990, having gotten wind that he was under investigation. Tr. 69–70. Vega also testified that he had only employed Randy Lane as a courier for three or four months and had severed his relationship with the Lanes in the summer of 1989, after Judy Lane informed him that Randy had lost one of the marijuana shipments. Tr. 55–57. Thus, by the time the Lanes were arrested, two and a half years had passed since their last involvement in the conspiracy, and the conspiracy itself been defunct for between eighteen months and two years.[6] How and why the Lanes came to possess the sixteen pounds of marijuana and some of the related paraphernalia discovered at the time of their arrest is unexplained, although it certainly suggests that they may have continued or resumed marijuana distribution through other channels. But it offers no insight into what the Lanes' knowledge and intent was years earlier. *See United States v. Echeverri,* 854 F.2d 638, 645 (3d Cir.1988).[7]

■ Invoking Professor Wigmore's "doctrine of chances," 2 J. Wigmore, *Evidence* § 302 at 241 (Chadbourn rev. 1979), the government argues that the discovery of a distribution quantity of marijuana in the Lanes' home "tends to prove that the Lanes intended to distribute the marihuana in the indictment because it is statistically improbable that an innocent person would find himself or herself twice confronted with factors indicating he or she intended to distribute marihuana." Gov.Br. 18–19.[8] We agree that in an

---

**6.** Special Agent Yacup acknowledged at trial that the marijuana was not part of the conspiracy charged in this case, and that separate charges had been brought against the Lanes in state court based on this seizure. Tr. 896.

**7.** Having concluded that the evidence was not probative of the Lanes' knowledge and intent, we need not take up the Lanes' argument that we should reconsider our prior cases holding that when the defendant has been charged with a specific intent offense, Rule 404(b) evidence is admissible to prove his intent even where intent is not expressly disputed. *See United States v. Kramer,* 955 F.2d 479, 492–93 (7th Cir.1992) (Cudahy, J., concurring), *cert. denied,* ── U.S. ──, ──, 113 S.Ct. 595, 596, 121 L.Ed.2d 533 (1992).

**8.** As the government points out, we relied on the doctrine of chances in *United States v. York,* 933

F.2d 1343, 1350 (7th Cir.), *cert. denied,* ── U.S. ──, ──, 112 S.Ct. 321, 651, 116 L.Ed.2d 262 (1991), to sustain the admission of evidence that a defendant charged with defrauding an insurance company by murdering his business partner and collecting the proceeds of her life insurance had previously murdered his wife and collected the insurance proceeds on that occasion as well. We reasoned that "the odds of the same individual reaping the benefits, within the space of three years, of two grisly murders of people he had reason to be hostile toward seem incredibly low, certainly low enough to support an inference that the windfalls were the product of design rather than the vagaries of chance." *Id.* We also pointed out that this evidence was particularly relevant in view of the innocent explanations the defendant had tendered for his conduct in connection with the second murder. *Id.* We think two points distinguish *York* from the case at

appropriate circumstance, evidence of the defendant's subsequent criminal activity might be admissible to prove that his prior conduct was not unwitting or accidental, particularly when the later incident occurs within a relatively short time of the first and shares a common pattern. *See, e.g., United States v. Johnson,* 934 F.2d 936, 940 (8th Cir.1991); *Bibo–Rodriguez,* 922 F.2d at 1400; *Watson,* 894 F.2d at 1349. Thus, when a defendant raises the defense that he was duped on the first occasion, evidence of subsequent conduct may be admissible to establish that his conduct was not inadvertent but knowing. *Bibo–Rodriguez,* 922 F.2d at 1400. But insofar as the record reflects, the Lanes did not contend that their involvement in Vega's alleged conspiracy was unwitting. Even if they had, we are not persuaded that evidence of the marijuana and related items found in their house some two years after the conspiracy ended would have had much bearing on such a contention. To argue, as the government does, that an innocent person would likely not be caught twice in the midst of what appears to be marijuana distribution seems to us another way of saying that because the Lanes were found possessing distribution-sized quantity of marijuana at the time of their arrest, they were more likely to have engaged in the 1987–90 conspiracy as alleged. That is a poorly disguised propensity argument, and that is exactly what Rule 404(b) prohibits. *See Beasley,* 809 F.2d at 1278.

We are troubled by the concurrence's suggestion that the marijuana may have been admissible to establish that the Lanes were involved in the drug business on a continuing basis and thus were more likely to have participated in the charged conspiracy. *Post* at 766–67. Perhaps, as the concurrence asserts, "evidence that someone's drug trafficking is his or her principal occupation may be quite probative of whether he or she was a participant in a particular conspiracy...." *Post* at 766. But Rule 404(b)'s proscription of propensity evidence is not premised on the notion that such evidence lacks probative value. Rather, as the Supreme Court explained

in summarizing the common law tradition later codified in the rule:

> The State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise, and undue prejudice.

*Michelson v. United States,* 335 U.S. 469, 475–76, 69 S.Ct. 213, 218–19, 93 L.Ed. 168 (1948) (footnotes omitted); *see also United States v. Wright,* 901 F.2d 68, 70 (7th Cir. 1990); *United States v. Williams,* 739 F.2d 297, 300 (7th Cir.1984); *United States v. Daniels,* 770 F.2d 1111, 1116 (D.C.Cir.1985).

■ The concurrence suggests that there is a distinction between proof of a defendant's propensity to commit drug offenses and proof that drug trafficking was his *occupation. Post* at 766–67. If there is such a distinction, we are hard pressed to identify it. Under either rubric, the jury is invited to conclude that if the defendant dealt drugs on other occasions, he in all probability went astray this time as well. Put another way, the defendant's other acts are offered not to establish his intent, motive, plan, modus operandi, or any other matter permitted by Rule 404(b), but rather his *conduct.* Rule 404 could not be clearer in proscribing such evidence. *See* 3 Louisell & Mueller, § 136 at 124 ("It is the unmistakable directive of Rule 404(a) that ... evidence of a person's character, or pertinent trait of character, shall not be received if it is relevant only as tending to show that the person engaged in certain conduct on a particular occasion. In other

---

hand: first, the other act at issue in *York* involved extremely unique circumstances; and second, that act occurred prior to the charged offense, thus more readily illuminating the defendant's intent with respect to the allegations of the indictment.

words, the basic rule is that character evidence may not be introduced circumstantially to prove conduct."); *Wright*, 901 F.2d at 70.

Generally, we have no quarrel with the Second Circuit's statement that "[n]arcotics is a business, though an illegitimate one, and evidence that the defendants were in the business at a closely related time is relevant, and is not a mere showing of bad character." *United States v. Viserto*, 596 F.2d 531, 537–38 (2d Cir.), *cert. denied*, 444 U.S. 841, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979). But relevant in what sense? We find in *Viserto* no endorsement of the notion that a defendant's involvement in the narcotics business at one time is relevant to demonstrate the probability that he was similarly engaged at another. *See post* at 767. On the contrary, the three cases cited in *Viserto* for the relevance of such evidence (*see* 596 F.2d at 538) reflect the usual purposes for which Rule 404(b) evidence is properly offered. *See United States v. Magnano*, 543 F.2d 431, 435 (2d Cir.1976) (prior narcotics dealings admissible "for the legitimate purpose of showing the background and development of the conspiracy"), *cert. denied*, 429 U.S. 1091, 97 S.Ct. 1100, 1101, 51 L.Ed.2d 536 (1977); *United States v. Conley*, 523 F.2d 650, 654 (8th Cir. 1975) (per curiam) (prior narcotics activity "was admissible to show the defendant's knowing and intentional development of a scheme to sell heroin and of a plan to do so consistent with the actual mode of distribution"), *cert. denied*, 424 U.S. 920, 96 S.Ct. 1125, 47 L.Ed.2d 327 (1976); *United States v. Torres*, 519 F.2d 723, 727 (2d Cir.) (prior narcotics purchases admissible "to show the background and development of a conspiracy"), *cert. denied*, 423 U.S. 1019, 96 S.Ct. 457, 46 L.Ed.2d 392 (1975). The stash of marijuana discovered in the Lanes' home, coming more than two years after their participation in the conspiracy ended, serves none of these familiar purposes. *See United States v. Zelinka*, 862 F.2d 92, 99 (6th Cir.1988) (discovery of cocaine on defendant's person at time of his arrest not admissible to prove his participation in conspiracy that had ended seventeen months earlier); *see also United States v. Rodriguez*, 943 F.2d 215, 218 (2d Cir.1991); *United States v. Bakke*, 942 F.2d 977, 982–83 (6th Cir.1991).

The issue here was not whether Randy and Judy Lane were professional purveyors of marijuana, but whether they joined the particular conspiracy alleged in the indictment. *See Zelinka*, 862 F.2d at 99. The concurrence has constructed a chain of inferences in an effort to establish the relevance of the marijuana to this question, reasoning from the discovery of the stash in the basement freezer that marijuana trafficking was the Lanes' principal occupation and from there that the Lanes were more likely to have joined Vega and the others in a conspiracy to distribute more than two years earlier. *Post* at 766–67. We are, as we have noted, unable to distinguish this from a propensity argument. *See Wright*, 901 F.2d at 70. What is more, we believe it stretches the record to assume from the mere discovery of the marijuana in the Lanes' home that they had made a *career* of drug dealing, an assumption that appears to be the springboard for the concurrence's reasoning. *See post* at 766–67. Even if that assumption is correct, we are all the more convinced that the admission of this evidence was erroneous. A defendant's guilt must be determined based on proof of the particular offense charged in the indictment, not his criminal history. *United States v. Torres–Flores*, 827 F.2d 1031, 1035–36 (5th Cir.1987); *United States v. Lewis*, 787 F.2d 1318, 1321 (9th Cir.), *amended on other grounds*, 798 F.2d 1250 (1986); *Daniels*, 770 F.2d at 1116.

■ Although we thus conclude that the admission of this evidence constituted an abuse of discretion, we also believe that the error was harmless. The evidence against Randy Lane was overwhelming. Both Vega and Flores testified that Randy made multiple trips to Texas to retrieve marijuana. Tr. 48–50, 255, 259–60, 264; Flores Tr. 15–16. Other co-conspirators, including David Overturf and Eddie Thompson, testified similarly. Tr. 404–06, 408–09; Thompson Direct/Partial Cross Tr. 9–10. Thompson recalled once hearing Vega instruct Randy to make a trip to Texas to pick up a shipment of marijuana; Thompson also saw Randy at Flores' home in Texas on one occasion. Thompson Direct/Partial Cross Tr. 8–12. In addition, Thompson and Vega both testified that the

Lane residence was used as a stash house for the marijuana. Thompson Direct/Partial Cross Tr. 5–7; Thompson Cross Tr. 4–6; *see also* Tr. 50–55, 264. Kevin Baldwin, another courier, also confirmed that he had been to the Lanes' home and had seen marijuana stored in their basement. Tr. 320–24, 393. The evidence against Judy Lane was not as pervasive, but was equally damning. Vega testified that Judy Lane assisted with the packaging of marijuana (Tr. 54, 264) and that she had participated in conversations concerning the details of Randy's trips to Texas (Tr. 60–61). Vega also described one occasion on which he was present at Overturf's mobile home, which he used as a stash house, when Judy Lane apprised him by telephone that she would be bringing Randy by with a shipment of marijuana he had just brought back from Texas. Tr. 65–68; *see also* Tr. 427–28. Overturf himself testified that he had been at the Lane home on several occasions and witnessed Judy taking part in conversations regarding drug runs (Tr. 408, 427); he had also seen her retrieve a suitcase containing marijuana when Vega visited the residence (Tr. 408). This testimony was direct and ample evidence of Judy's involvement in the conspiracy. Accordingly, we have no question that had the evidence proffered under Rule 404(b) been excluded, the jury would have convicted both Judy and her husband nonetheless. *See generally Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946); *United States v. Manganellis,* 864 F.2d 528, 539 (7th Cir.1988).

Finally, we note that Betts has likewise challenged the admission of the Rule 404(b) evidence, contending that it unduly prejudiced him as well as the Lanes. Yet, the district court expressly instructed the jury that it was to consider the evidence only as to the *Lanes'* knowledge and intent (Tr. 515–

16, 819), and Betts has not offered us any reason to believe this admonition was inadequate to shield him from any prejudice that may have attended admission of the Rule 404(b) evidence. *See United States v. Tuchow,* 768 F.2d 855, 865 n. 10 (7th Cir.1985); *see also United States v. Perez–Garcia,* 904 F.2d 1534, 1545 (11th Cir.1990); *Ramirez,* 894 F.2d at 570.[9]

## C.   Failure to *Mirandize* Betts

■■■ Betts argues that the district court erred in denying his motion to suppress the statements he made to officers Key and Otey on September 13, 1990, because the officers failed to apprise him of his *Miranda* rights before questioning him. *Miranda* held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from *custodial interrogation* of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966) (emphasis supplied). Although Betts was not under arrest when he spoke with Otey and Key, he maintains that the questioning was nonetheless custodial, emphasizing that the officers arrived at his mother's home unannounced, put him in their car, and interviewed him at the Williamson County Sheriff's Department for ninety minutes without advising him that he was free to terminate the interview. The district court concluded that these circumstances did not render the interrogation of Betts custodial. We review this decision only for clear error. *United States v. Kelly,* 991 F.2d 1308, 1311 (7th Cir.1993).

Whether an individual is in custody for purposes of *Miranda* turns on the degree to which his freedom has been restricted. Thus, the Court explained in *Miranda:* "By custodial interrogation, we mean questioning

---

9.   We are satisfied that the evidence against Betts was also overwhelming. Vega testified that Betts had made between five and ten runs to Texas on his behalf. Tr. 31, 32, 45. Flores likewise identified Betts as a courier. Flores Tr. 15. Carla Berberich said that she had accompanied Betts on a run to Texas. Tr. 268–73, 306. Baldwin recalled accompanying Vega on one occasion to a bus station in Carbondale to pick Betts up on his return from Houston; Vega and Baldwin had then driven Betts to a mobile home belonging to Vega's girlfriend, where Vega inspected the marijuana contained in Betts' suitcase. Tr. 317–20, 360–62. Finally, Thompson, Overturf, and Baldwin all testified that Vega had told them that Betts was one of his couriers—one of his best, according to Thompson. Thompson Direct/Partial Cross Tr. 13, 28; Tr. 316, 319, 360–62, 411–12.

initiated by law enforcement officers after a person has been taken into custody *or otherwise deprived of his freedom of action in any significant way.*" 384 U.S. at 444, 86 S.Ct. at 1612 (emphasis supplied). *See also Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (per curiam) ("*Miranda* warnings are only required *where there has been such a restriction on a person's freedom* as to render him 'in custody.' "). And, as the Court elaborated in *California v. Beheler,* "[a]lthough the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam) (quoting *Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714). *See also Kelly,* 991 F.2d at 1312; *United States v. Bush,* 820 F.2d 858, 861 (7th Cir.1987).

Here, the circumstances do not suggest that Betts' freedom was restricted in any way, let alone to a degree commensurate with arrest. The interview did take place at the Sheriff's Department, but the Supreme Court has twice held that this fact alone does not require *Miranda* warnings. *Beheler,* 463 U.S. at 1125, 103 S.Ct. at 3520; *Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714. At a minimum, the evidence established that Betts had "no problem" with the interview proceeding at that location; and by Otey's account, Betts actually chose it over the other two possibilities Otey suggested (driving around in the car or adjourning to a local Hardee's). Betts Suppr.Tr. 59, 64–65. Further, when the three arrived at the department, Betts was not taken to the cramped confines of an interrogation room, but to the more public squad room, where the doors were left open and others came and went while the interview was conducted. Betts Suppr.Tr. 60, 67. The interview was lengthy (ninety minutes), but throughout that time Betts was allowed to smoke and Otey at one point fetched him a soda. Betts Suppr.Tr. 60. Thus, nothing in the physical environs or manner of the interview signals a restraint on Betts' freedom.

On the contrary, the record indicates that Betts freely cooperated with the questioning without overt pressure from the authorities: he had appeared earlier at the Sheriff's Department to speak with Webb; he had told Webb at the conclusion of that meeting that he would be happy to answer further questions; and he had left with Otey and Key willingly when they arrived at his home on September 13. By all accounts, Betts was never told that he must answer the officers' questions or given the impression that he could not come and go as he pleased. Certainly, "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714. But absent facts establishing a restraint on the suspect's freedom, *Miranda* warnings are not required. *Id.* Those facts are missing here. Insofar as the record shows, the officers' request that Betts speak with them was a request and nothing more. Indeed, the fact that Betts had declined to speak with Otey and Key two days earlier and asked them to return at a later date suggests that Betts appreciated the consensual nature of the questioning. And although the officers returned unannounced, as Betts points out, it appears that they did so because Betts' mother, who is deaf, did not have a telephone in her home. Betts Suppr.Tr. 63–64; *see also* Tr. 692. Finally, even if, as Betts suggests, the authorities suspected him of criminal involvement in the Vega conspiracy by the time he was interviewed on September 13, that fact does not, by itself, trigger *Miranda. Beheler,* 463 U.S. at 1125, 103 S.Ct. at 3520; *Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714.

Under these circumstances, we discern no error—clear or otherwise—in the district court's determination that the questioning of Betts was noncustodial and that *Miranda* warnings were therefore unnecessary.

D. Randy Lane's Waiver of his *Miranda* Rights

 ▮ Randy Lane also raises a *Miranda* issue, contending that the statements he

made at the time of his arrest were obtained in violation of *Miranda* and should have been suppressed. Insofar as the record discloses, the only material statement of Lane's to be admitted at trial was his remark, when asked where "the drugs" were, that "[t]hey're down in the basement in the deep freezer." Lane Suppr.Tr. 50, 142. Lane had already been arrested and handcuffed by the time he made this statement and was thus unquestionably in custody; the government consequently bore the burden of establishing by a preponderance of the evidence that Lane was apprised of his *Miranda* rights before he made the statement, that he understood these rights, and that he waived them without any coercion by the authorities. *Colorado v. Connelly*, 479 U.S. 157, 168–69, 107 S.Ct. 515, 522–23, 93 L.Ed.2d 473 (1986); *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979); *Miranda*, 384 U.S. at 475, 86 S.Ct. at 1628.

Whether an individual has knowingly and voluntarily waived his *Miranda* rights depends on the totality of the circumstances, *Fare v. Michael C.*, 442 U.S. 707, 724–25, 99 S.Ct. 2560, 2571–72, 61 L.Ed.2d 197 (1979), and the district court's assessment on this subject is a factual one we review for clear error, *United States v. Clark*, 943 F.2d 775, 783 (7th Cir.1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 3045, 125 L.Ed.2d 730 (1993); *United States v. D'Antoni*, 856 F.2d 975, 982 (7th Cir.1988).[10] The waiver need not be express, but may be inferred from the defendant's understanding of his rights coupled with a course of conduct reflecting his desire to give up his right to remain silent and have the counsel of an attorney. *Butler*, 441 U.S. at 373, 99 S.Ct. at 1757; *see also Michael C.*, 442 U.S. 724–25, 99 S.Ct. at 2571–72. In this instance, we find the record sufficient to establish that Lane was apprised of his rights under *Miranda* and freely chose to waive them, as the district court found. Lane Suppr.Tr. 142–43. Special Agent Yacup testified at the suppres-

sion hearing that he delivered *Miranda* warnings to the Lanes immediately after the officers were admitted to their home and he explained that they were under arrest. Lane Suppr.Tr. 42. Although the Lanes both claimed that they were never apprised of their rights, the district court expressly rejected that contention: "It is quite clear to me that ... the rights under *Miranda* ... were given to the defendants. I think there's no question ... that that was done up front, right off of the bat so to speak." Lane Suppr.Tr. 139–40; *see id.* at 143. This finding, which rests on the district judge's reasonable credibility assessments, is one we accept. *Cardona–Rivera, supra*, 904 F.2d at 1152; *see also Clark*, 943 F.2d at 783; *D'Antoni*, 856 F.2d at 980. We also note that Randy made the statement about the location of the marijuana not only after he had been admonished of his rights but after he had already consented orally and in writing to a search of the house. Although he suggests that he was confused and did not understand his rights, the record reveals otherwise. Yacup testified that Randy and Judy Lane both indicated that they understood the rights he had read to them. Lane Suppr.Tr. 42. Moreover, as we have noted, although the encounter took place at an early hour, Mr. Lane appears to have been in full possession of his faculties, and there is no evidence that he was in any manner coerced into responding to the officers' questions. *See Michael C.*, 442 U.S. at 726–27, 99 S.Ct. at 2572–73. Nor is there any evidence that Lane suffered from any impediment that might have rendered the *Miranda* warnings ineffective; on the contrary, Lane's previous encounters with the law most likely enhanced his appreciation of his rights, as the district court observed. Lane Suppr.Tr. 143. *See Michael C.*, at 726, 99 S.Ct. at 2572; *United States v. Meirovitz*, 918 F.2d 1376, 1379 (8th Cir.1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 101, 116 L.Ed.2d 71 (1991). Thus, when Lane told the officers that "the drugs"

---

10. Of course, the ultimate question of whether the *Miranda* waiver was truly voluntary is a question of law subject to de novo review. *Baskin v. Clark*, 956 F.2d 142, 145 (7th Cir.1992) (citing *Miller v. Fenton*, 474 U.S. 104, 117, 106 S.Ct. 445, 453, 88 L.Ed.2d 405 (1985)), *cert.* denied, —— U.S. ——, 113 S.Ct. 109, 296, 121 L.Ed.2d 67 (1992); *D'Antoni*, 856 F.2d at 981. Even under that more searching standard, however, we conclude that Lane's waiver was indeed voluntary, untainted by any coercive conduct on the part of the authorities.

were in the basement deep freeze, he knowingly and voluntarily waived his right to remain silent. His statement was therefore admissible at trial.

### E. Exclusion of Sassi Testimony

Betts challenges his inability to elicit certain testimony from Steven Sassi. Sassi was incarcerated at the Perry County Jail with Vega between April 6 and April 20, 1992, just prior to appellants' trial. According to Betts, Sassi was prepared to testify that Vega told him he was testifying against Betts and the Lanes in exchange for the government's promise to request that his sentence be reduced from twenty to twelve years.[11] The district court excluded this testimony pursuant to Fed.R.Evid. 613(b) because, in the court's view, Betts' counsel had not given Vega an adequate opportunity to explain or deny the statement on cross-examination before attempting to prove the statement through Sassi. Tr. 748–49. The district court also pointed out that the terms of Vega's plea agreement had been established during Vega's testimony. Tr. 749.

■■■■ On appeal, Betts contends that Rule 613(b) is inapplicable, because his purpose was not to establish an inconsistent statement, but to attack Vega's credibility more generally by establishing a motive for fabrication. Betts Br. 15. Betts, of course, had every right to establish Vega's interest in assisting the government. *See generally United States v. Abel*, 469 U.S. 45, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984); 3 David W. Louisell and Christopher B. Mueller, *Federal Evidence* § 341, at 321 (Supp.1993). Even so, the weight of authority supports the proposition that when a party seeks to prove bias through extrinsic evidence of a witness' prior statement, he must first give the witness the opportunity to explain or deny that statement, even though Rule 613(b) is not strictly applicable. *United States v. Marzano*, 537 F.2d 257, 265 (7th Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1977); 3 Louisell & Mueller § 341, at 479–80 & n. 40 (1979). In any case, Sassi's anticipat-

ed testimony would have been cumulative on this point. The plea agreement itself indicated that depending on Vega's cooperation, the government might move for a reduction in Vega's sentence to a term of twelve years. Gov.Ex. 1, § II ¶ 9. Vega acknowledged the agreement on direct examination, and repeatedly voiced his expectation that the government would seek a reduction of his sentence in exchange for his cooperation. Tr. 4–6. Indeed, on cross-examination by Betts' counsel, Vega conceded the very point that Betts hoped to establish through Sassi:

Q. Have you told anyone that because of your testimony here today that your sentence is going to be reduced to 12 years?

A. That was my plea agreement. I was figuring I was getting 12 years, and—but then I got 20, you know.

Q. So you have told people that you're going to?

A. I told them I might be—I'm hoping that I'm getting 12 years.

Tr. 204; *see also* Tr. 205–06. Thus, as the district court recognized, Sassi's testimony would have established nothing that Vega himself had not already admitted. Tr. 749. Under these circumstances, the exclusion of Sassi's testimony regarding Vega's out-of-court statement was not erroneous, let alone prejudicial to Betts.

### F. Refusal to Grant a Downward Departure

■■■ Finally, Betts challenges the district court's refusal to depart downward from the sentencing range. By the time Betts was sentenced, Vega—the admitted kingpin of the conspiracy, whose vindictive nature had led him to threaten the lives of two government agents (Tr. 592, 635, 636)—had had his sentence reduced to twelve years as he had hoped. Flores—who had supplied over $500,000 worth of marijuana to Vega for distribution—had been sentenced to only sixty months in custody. Yet Betts—a courier whose participation in the conspiracy ended in April 1989—faced a sentence of at least 360 months and possibly as long as life.

---

**11.** Vega's sentence had not yet been reduced when he testified against Betts and the Lanes. However, by the time the defendants were sen-

tenced, Vega had been granted a reduction to 144 months.

Judge Foreman remarked that in his twenty years on the bench, he had never faced a more draconian situation (Betts Sentencing Tr. 20); nonetheless, the judge believed himself to be without authority to consider the downward departure that Betts' counsel urged (Betts Sentencing Tr. 5, 14, 20, 26). Although we likewise acknowledge the relative harshness of Betts' sentence, we believe that the district court's conclusion was correct.

What compelled the lengthy sentence in Betts' case was the career offender provision of the Sentencing Guidelines. *See* United States Sentencing Commission, *Guidelines Manual,* § 4B1.1 (Nov.1991). That provision implements the express command of Congress that defendants who are convicted of drug-related offenses receive prison terms at or near the statutory maximum when they previously have been convicted of two or more such offenses. 18 U.S.C. § 924(h). Betts had three prior drug-related convictions: in 1972, 1975, and 1988; thus, Guidelines section 4B1.1 compelled a thirteen-level increase in his offense level from 24 to 37, producing a sentencing range of 360 months to life. Absent that adjustment, the sentencing range would have been fifty-one to sixty-three months, a range much more in keeping with the sentences Vega and Flores ultimately received. But Vega and Flores, although their involvement in the conspiracy was undeniably more extensive, lacked the type of criminal record which triggered the career offender provision in Betts' case. Thus, despite the significant disparity between Betts' sentence and those Vega and Flores received, the district court was powerless to depart from the Guideline range. *United States v. Fonville,* 5 F.3d 781, 784 (4th Cir. 1993), *petition for cert. filed* (U.S. Jan. 24, 1994) (No. 93–7612). *See also United States v. LaSalle,* 948 F.2d 215, 218 (6th Cir.1991); *United States v. McDougherty,* 920 F.2d 569, 576 (9th Cir.1990), *cert. denied,* 499 U.S. 911, 111 S.Ct. 1119, 113 L.Ed.2d 227 (1991); *and see United States v. Edwards,* 945 F.2d 1387, 1398 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992);

*United States v. Guerrero,* 894 F.2d 261, 267–68 (7th Cir.1990). The Sentencing Guidelines leave little room for mercy, and Betts received the full benefit of the district judge's limited discretion when he was sentenced at the very bottom of the sentencing range.[12]

### III.  CONCLUSION

For the foregoing reasons, we affirm the convictions of Randy Lane, Judy Lane, and Edward Betts and likewise affirm Betts' sentence.

AFFIRMED.

CUDAHY, Circuit Judge, concurring.

I am reluctant to write separately because I agree without reservation with almost all of the majority's thoughtful and thorough opinion. But I find the issue of the admissibility of the sixteen pounds of marijuana and related paraphernalia against the Lanes to be perplexing.

The majority concludes that the admission of that evidence is erroneous. If that is the case, I am troubled by the conclusion that the error is harmless. The Supreme Court has, of course, made clear that an appellate court may treat an error as harmless where the evidence of the defendant's guilt, error aside, is overwhelming. *See Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972). The point is that where the untainted evidence of guilt is so overwhelming that a jury couldn't help but convict, it is extremely doubtful that any error that may have been committed made any difference. The majority here finds the independent evidence of guilt to be sufficiently overwhelming to render the error harmless. *See* Maj.Op. at 760–61. This troubles me, because it seems to me that in certain cases courts are willing to conclude that, as long as they are convinced that the defendant is guilty, any error is harmless. *Cf. Stephens v. Miller,* 13 F.3d 998, 1001–1002 (7th Cir.1994) (Cudahy, J., dissenting). As a result, the expansive code of rights afforded criminal

---

**12.** The career offender provision resulted in the same sentencing range for Randy Lane, whom the district court also sentenced to 360 months.

defendants—designed to assure that they be tried fairly—becomes as elusive as "the grapes of Tantalus, since the equally expansive harmless error rule in most cases prevents a criminal defendant from obtaining any benefit from the code." *United States v. Pallais,* 921 F.2d 684 (7th Cir.1990).

Where evidence is erroneously admitted, a new trial is required unless "when all is said and done, the [appellate court's] conviction is that the error did not influence the jury, or had but very slight effect." *Kotteakos v. United States,* 328 U.S. 750, 764, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946). Further, our inquiry "cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Id.*

In the context of this case, the stash of marijuana, at least to my mind, is quite probative and lends a solid plus to the prosecutor's case. But while this is a close question, I ultimately agree with the majority that the independent evidence of guilt was sufficiently overwhelming to find—in this case—that the error was harmless.

But, by the same token, I harbor some doubt whether the introduction of this evidence should even be seen as erroneous in the first instance. The subject of Rule 404 is, of course, character evidence. The purpose of Rule 404(b) is to prohibit the use of other bad acts evidence to prove the bad character of the accused and his or her resulting propensity to do bad things. And the rule excludes the use of evidence of other crimes only where those crimes would be used to prove a person's character. But such evidence is admissible when introduced in order to prove other facts and propositions, some of which are enumerated in the rule, which do not involve character.

Here the district court admitted the marijuana stash under the omnibus category of "knowledge and intent". The theory is that the government has the burden of proving that the defendants knew that what they were importing was marijuana. So if criminal defendants are laboring under the misapprehension that the cargo in their speed boats (that they were smuggling into the United States from South America in the still of night) was a giant shipment of oregano, then they lack the requisite "knowledge and intent," and cannot be convicted of a drug offense of which intent is an element. The circumstances of this case make it similarly obvious that the defendants knew the nature of their cargo, and in any event are not claiming that they lack knowledge or intent. While I have earlier expressed my reservations about this entire theory, especially in cases where "knowledge and intent" are not disputed, *see United States v. Kramer,* 955 F.2d 479, 492–93 (7th Cir.1992) (Cudahy, J., concurring), *cert. denied,* —— U.S. ——, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992), the law in this circuit clearly embraces it.

Thus, to prove that the defendants knew what marijuana was, the government showed the jury that they had sixteen pounds of it in their house in 1992. The majority opinion concludes that this evidence ought to have been excluded because it came to light such a long time after the charged conspiracy. The majority's theory is that, unlike prior convictions for drug possession, what the defendants possessed *after* the conspiracy is not probative (or at least less probative) of what they knew or intended during the conspiracy.

I do not find that distinction compelling. The theory suggests that the defendants may have learned what marijuana was in the eighteen months between the date of the conspiracy and the time the drugs were found in their house. *Compare* 2 Jack N. Weinstein & Margaret A. Berger, *Weinstein's Evidence,* ¶ 404[08] (1992) ("It does not matter whether the proffered act occurred prior or subsequent to the charged crime so long as relevancy to the consequential fact is shown."). But even if the majority is correct in concluding that this evidence is inadmissible to prove knowledge and intent, it is still admissible so long as it is not being used to prove the defendants' bad character and their resulting propensity to trade in drugs.

On the facts of this case this evidence may tend to show an ongoing business, which at one time involved the charged conspiracy. And it seems to me that evidence that some-

one's drug trafficking is his or her principal occupation may be quite probative of whether he or she was a participant in a particular conspiracy, apart from generalized concerns about the person's "character". As the Second Circuit noted in *United States v. Viserto*, 596 F.2d 531, 537 (2d Cir.), *cert. denied*, 444 U.S. 841, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979), "narcotics is a business," and evidence that the defendants were in the business at one time is relevant to show that they were in it at another. In so holding, the Second Circuit insisted that showing that a defendant is engaged in the drug trade "is not a mere showing of bad character." *Id. See also United States v. Carson*, 702 F.2d 351, 369 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 2457, 77 L.Ed.2d 1335 (1983). The majority opinion itself states almost as much, indicating that the Lanes' possession of the sixteen pounds of marijuana and related paraphernalia "certainly suggests that they may have continued or resumed marijuana distribution through ... channels [other than the charged conspiracy]." Maj.Op. at 758.

The question I would pose then is whether the continuing conduct of the narcotics business is precisely the same thing as having a drug-oriented character and a resulting personal propensity for narcotics trafficking. To my way of thinking there may be a difference between introducing evidence of a prior rape to prove that a person has a propensity to commit rape (which is plainly forbidden by Rule 404(b)), and showing that a person, without particular reference to his character, is engaged in conducting a drug business on a continuing basis, first with one set of conspirators and later with others. While the rule forbids the use of evidence of a defendant's "character" as a rapist to infer that he committed the rape in question, perhaps it is a different matter to ask the jury to infer from the defendant's being in a continuing illegal business that he participated in the conspiracy in question. At least, the use of "continuing illegal business" evidence seems to me somehow fairer than a mere showing of character and the resulting propensity to commit a crime.

The distinction between evidence of drugs as a "business" and rank character evidence is admittedly a fine one—and perhaps a nonexistent one. Ultimately, the distinction may be too fine to allow the admission of the marijuana stash in this case. But because I (reluctantly) agree with the majority that any error in this case would have been harmless, I do not feel the need to resolve this question with greater certainty.